## NEW YORK CENTRAL SECURITIES CORPORATION *v.* UNITED STATES ET AL.

No. 5. Argued October 14, 17, 1932.—Decided November 7, 1932.

14

*Mr. Frederick A. Henry,* with whom *Messrs. Louis J. Vorhaus* and *Joseph Fischer* were on the brief, for appellant.

16

18

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Thacher* and *Assistant to the Attorney General O'Brian* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. Jacob Aronson,* with whom *Mr. Charles C. Paulding* was on the brief, for the New York Central Railroad Company et al., appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

On July 2, 1929, the Interstate Commerce Commission made an order authorizing the New York Central Railroad Company to acquire control, by lease, of the railroad systems of the Cleveland, Cincinnati, Chicago & St. Louis Railway Company (known as the ' Big Four ') and of the Michigan Central Railroad Company. By order of December 2, 1929, the Commission permitted the assumption by the lessee of obligation and liability in respect of certain securities of the lessors. In this suit, a minority stockholder of each of the lessors, and of the lessee, sought to set aside these orders upon the ground that the Commission had exceeded its authority. The District Court, of three judges, upon pleadings and proofs, and having filed findings of fact and conclusions of law, denied the motion for injunction and dismissed the petition upon the merits. 54 F. (2d) 122. The petitioner appeals. U. S. C., Tit. 28, §§ 47, 345.

The District Court, against objection, sustained its jurisdiction. The court took the view that the petitioner,

as a minority stockholder of the lessors, alleged an injury not merely derivative, but independent, being a member of a class created by the leasing agreements. 54 F. (2d) at p. 126; compare *Pittsburgh & West Virginia Ry. Co. v. United States*, 281 U. S. 479, 487. While appellees submit that there are certain contentions which appellant may not properly raise, the correctness of the decision as to jurisdiction is conceded.

The authority of the Commission to make the orders is rested upon § 5, subdivision 2, and § 20a of the Interstate Commerce Act. U. S. C., Tit. 49.[1] After full hearing, and upon consideration of the purpose of the proposals, of the physical, traffic and intercorporate relationships, of investment, income and dividends, of the provisions of the proposed leases, of the benefits deemed to accrue to the public, of the particular situation of certain short lines, and of the objections raised by minority stockhold-

---

[1] The pertinent provisions of these sections are as follows:

"Sec. 5 (2): *Acquisition of control of one carrier by another.*— Whenever the commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this chapter, that the acquisition, to the extent indicated by the commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the commission to be just and reasonable in the premises. . . ."

"Sec. 5 (8): *Carriers affected relieved from operation of antitrust laws, etc.*—The carriers affected by any order made under the foregoing provisions of this section and any corporation organized to effect a consolidation approved and authorized in such order are relieved from the operation of the 'antitrust laws,' as designated in section 12 of Title 15, Commerce and Trade, and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to

ers, the Commission found that the "considerations and terms and conditions" set forth in the proposed leases were "just and reasonable" and that the contemplated acquisition would be "in the public interest." The authorization was upon the express condition that before the leases became effective, the New York Central should offer to acquire specified short lines upon terms and conditions stated. Report, January 14, 1929, 150 I. C. C. 278, 321, 322. Upon proof of compliance with this condition, and upon further conditions, the acquisition was approved. Supplemental Report and Order of July 2, 1929, 154 I. C. C. 489, 494, 495. One of the conditions was that the New York Central and the 'Big Four' should not be relieved from compliance with provisions of law applicable to any assumption of obligations and liabilities by virtue of the execution of the leases. On later appli-

---

enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section. . . ."

"Sec. 20a (2): *Issuance of securities; assumption of obligations; authorization.*—It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section' collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose. . . ."

cation for authority in that respect, the Commission found that the proposed assumption by the carriers was "for a lawful object within their corporate purposes, and compatible with the public interest, which is necessary and appropriate for and consistent with the proper performance by them of service to the public as common carriers, and which will not impair their ability to perform that service" and was "reasonably necessary and appropriate for such purpose." Report and Order of December 2, 1929, 158 I. C. C. 317, 323, 328.

Appellant contends (a) that as the New York Central had already acquired control of the 'Big Four' and Michigan Central by stock ownership, the Commission could not authorize acquisition of control by lease; (b) that the proposed acquisition involved a "consolidation" which could not be authorized under § 5 (2); (c) that the main lines of the lessors are parallel and competing with those of the lessee so that competition would be suppressed, and that the attempt to confer authority upon the Commission to approve the acquisition of control was an unconstitutional delegation of power; (d) that the proposed leases transgressed limitations imposed by state authority; and (e) that the action of the Commission was unsupported by evidence and was arbitrary and confiscatory as to the appellant. The questions presented thus relate, in part, to the construction and validity of the statute and, in part, to the present application of the statute in view of the particular terms of the leases.

*First.* The Commission stated that, while the properties of the New York Central, the 'Big Four' and the Michigan Central are operated as separate units, the companies are under common control. This control has existed for many years. The Commission found that the New York Central held upwards of 99 per cent. of the stock of the Michigan Central and upwards of 91 per cent. and 84 per cent., respectively, of the common and

preferred stocks of the 'Big Four.' The authority to lease was sought in the view that it would facilitate revision of routes, and physical improvements needed for new routes, and would make possible important economies in operation which the Commission set forth in detail. Section 5 (2) authorizes the acquisition of control " to the extent indicated by the Commission." The question is not of the extent of the control, provided it stops short of " consolidation," but of the public interest in having the control maintained. The public interest is served by economy and efficiency in operation. If the expected advantages are inadequately secured by stock ownership and would be better secured by lease, the statute affords no basis for the contention that the latter may not be authorized although the former exists. The fact that one precedes the other cannot be regarded as determinative if the desired coordination is not otherwise obtainable. The disjunctive phrasing of the statute " either under a lease or by the purchase of stock " must be read in the light of its obvious purpose and cannot be taken to mean that one method must be exclusive of the other.

The statute refers to " control " in contradistinction to " consolidation." Subdivision (2) itself indicates that control by purchase of stock or by lease is not regarded as a " consolidation " as the word is there used. Its use is in the restricted sense of the formation of a " single system for ownership " as well as for " operation." This distinction between control where separate ownership continues, and consolidation where a single ownership is created, is a familiar one in the law. *Railroad Co.* v. *Georgia*, 98 U. S. 359, 363. That the Congress had this distinction in view appears from the other provisions of § 5. Thus, subdivision (6) permits carriers " to consolidate their properties or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership, man-

agement, and operation." This may be effected under stated conditions which contemplate the ownership by one corporation of the consolidated properties and the issue of securities upon that basis. The view that the proposed acquisition does not involve a " consolidation " contrary to the limitation in subdivision (2) is in accord with the long-continued construction of the statute by the Interstate Commerce Commission. Control of El Paso & S. W. System, 90 I. C. C. 732; Control of Alabama & Vicksburg, etc., 111 I. C. C. 161, 169; Lease of Pan Handle, 72 I. C. C. 128, 133; New York Central Leases, 72 I. C. C. 243; Control of Central Pacific, 76 I. C. C. 508; Nickle Plate Unification, 105 I. C. C. 425. And this administrative construction would be persuasive if the statute could be regarded as ambiguous. *United States* v. *Jackson,* 280 U. S. 183, 193; *Louisville & Nashville R. Co.* v. *United States,* 282 U. S. 740, 757. Whether the particular authorization, in the light of the situation of these carriers, would interfere with plans of the Commission for consolidation was an administrative question with which the Commission was competent to deal.

Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the " public interest." It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. Going forward from a policy mainly directed to the prevention of abuses, particularly those arising from excessive or discriminatory rates, Transportation Act, 1920, was designed better to assure adequacy in transportation service. This Court, in *New England Divisions Case,* 261 U. S. 184, 189, 190, adverted to that purpose, which was found to be expressed in unequivocal language; " to attain it, new rights, new

obligations, new machinery, were created." The Court directed attention to various provisions having this effect, and to the criteria which the statute had established in referring to " the transportation needs of the public," " the necessity of enlarging transportation facilities," and the measures which would " best promote the service in the interest of the public and the commerce of the people." *Id.* p. 189, *note.* See, also, *Texas & Pacific Ry. Co.* v. *Gulf, Colorado & Santa Fe Ry. Co.,* 270 U. S. 266, 277. The provisions now before us were among the additions made by Transportation Act, 1920, and the term " public interest " as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. So far as constitutional delegation of authority is concerned, the question is not essentially different from that which is raised by provisions with respect to reasonableness of rates, to discrimination, and to the issue of certificates of public convenience and necessity. *Intermountain Rate Cases,* 234 U. S. 476, 486; *Railroad Commission* v. *Southern Pacific Co.,* 264 U. S. 331, 343, 344; *Avent* v. *United States,* 266 U. S. 127, 130; *Colorado* v. *United States,* 271 U. S. 153, 163; *Chesapeake & Ohio Ry. Co.* v. *United States,* 283 U. S. 35, 42.

The fact that the carriers' lines are parallel and competing cannot be deemed to affect the validity of the authority conferred upon the Commission. The Congress, which had power to impose prohibitions in the regulation of interstate commerce, *Northern Securities Co.* v. *United States,* 193 U. S. 197, had equal power to foster that commerce by removing prohibitions and by permitting acquisition of control where that was found to be an aid

in the accomplishment of the purposes in view in the enactment of Transportation Act, 1920. See *New York* v. *United States,* 257 U. S. 591, 601; *Colorado* v. *United States,* 271 U. S. 153, 165. Exercising this paramount power, the Congress expressly provided in subdivision (8) of § 5, which has direct reference to subdivision (2), that " the carriers affected by any order made under the foregoing provisions of this section " are " relieved from the operation of the ' antitrust laws,' " and " of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section." The question whether the acquisition of control in the case of competing carriers will aid in preventing an injurious waste and in securing more efficient transportation service is thus committed to the judgment of the administrative agency upon the facts developed in the particular case.

Appellant contends that the provision of subdivision (8) of § 5, referring to " restraints or prohibitions by law, State or Federal " should be construed as limited to those restrictions which are of the same general character as the ' antitrust laws ' and not as applying to specific limitations imposed by state laws upon corporate powers with respect to the making of leases. Appellant invokes the laws of the States of incorporation in relation to leases of competing lines, and especially the laws of Ohio upon that subject and with respect to minimum rentals and security for payment and the preservation of property. It is sufficient for the present purpose to say that this contention cannot, in any event, avail the appellant. The question of the right of a State of incorporation, in a direct proceeding, to challenge the leases as *ultra vires* is not before us. See *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *United States,* 275 U. S. 404, 414. The order of the Commission under § 5 (2) is permissive, not man-

datory. There is no warrant for concluding that the Congress intended to fetter the exercise of the Commission's authority by requiring that the Commission before making its order must determine whether the acquisition is within the corporate powers of the carrier under state laws. The Commission has given its approval in the exercise of the authority conferred and the question of corporate powers cannot properly be raised in this suit to set aside the Commission's order. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co., supra; Claiborne-Annapolis Ferry Co.* v. *United States,* 285 U. S. 382, 391.

Nor is there ground for a different conclusion with respect to the Commission's order under § 20a, authorizing the assumption of obligations. Appellant points to the requirement in that section that the Commission shall make such an order only if it finds that the assumption by the carrier is " for some lawful object within its corporate purposes." But that this provision does not refer to state limitations upon corporate powers, but rather to the general field of corporate purposes, sufficiently appears from the context and from the legislative history of the clause. In creating federal supervision of the issue of securities by interstate carriers, the Congress, so far from making it necessary for the Commission to determine whether there had been compliance with state requirements, expressly provided in subdivision (7) of § 20a that the jurisdiction of the Commission should be " exclusive and plenary " and that approval other than as specified in that section, should not be necessary.[2]

---

[2] It appears that in the course of the consideration of the measure which ultimately became § 20a (2) the words " corporate purposes " were substituted for " corporate powers." 54 F. (2d) at p. 130, *note.* It should also be noted that, in connection with the provision which became subdivision (7) of § 20a, an amendment was offered in the House of Representatives to strike out that paragraph and to provide that no security should be issued under the Act " except in the man-

Another objection, urged against the order under § 5 (2), is that the Commission had no power to make the acquisition of certain short lines a condition of its approval of the leases. The condition is asserted to be a burdensome one, opposed by the New York Central when it made its application and involving the building up of an enlarged system. But § 5 (2) expressly authorized the Commission to impose conditions, and its action in so doing was not limited to conditions proposed or favored by the carriers. The Commission stated the facts as to each of the short lines (150 I. C. C., pp. 294–311) and the Commission found that those lines to which the condition relates were complementary to the New York Central System and that their preservation was "required by public convenience and necessity and for the maintenance of an adequate transportation system." *Id.*, p. 322. It cannot be said that the consideration of the situation of these short lines was not appropriate to the determination which the Commission was called upon to make or that the condition was arbitrarily imposed.

*Second.* Questions as to the alleged breach by the New York Central, as majority stockholder of the Michigan Central, of its fiduciary duty to the appellant as minority stockholder, in the light of the terms of the indenture under which the voted shares had been pledged to secure bonds, are not properly raised in this suit under the Urgent

---

ner and form prescribed by the laws of the state which created such common carrier, and that this section is not to be construed as a limitation of state authority, but only as cumulative thereof." The amendment was defeated. Cong. Rec., 66th Cong., 1st sess., vol. 58, pp. 8673, 8676. Mr. Esch, in the report of the measure to the House of Representatives, stated: "Without federal control, the carriers would have to be subjected to the diversified requirements of the several states. . . . The enactment of the pending bill will put the control over stock and bond issues exclusively in the hands of the Federal Government and will result in uniformity and greater promptness of action." Cong. Rec., 1st sess., House Report No. 456, p. 21.

Deficiencies Act (U. S. C., Tit. 28, § 47) and hence are not open to review on this appeal. *Pittsburgh & West Virginia Ry. Co.* v. *United States,* 281 U. S. 479, 488.

The remaining questions with respect to the adequacy of the rentals fixed, the other terms of the proposed leases, and the public interests involved, relate to the propriety of the action of the Commission in the exercise of its authority under the statute as construed. As to these matters the parties were fully heard, pertinent evidence was received and considered, and we find no basis for a contention that the order of the Commission was not adequately supported or had any confiscatory effect. *Virginian Ry. Co.* v. *United States,* 272 U. S. 658, 663; *Georgia Commission* v. *United States,* 283 U. S. 765, 775.

*Decree affirmed.*