**MACKAY RADIO & TELEGRAPH CO., Inc., v. FEDERAL COMMUNICATIONS COMMISSION (R. C. A. COMMUNICATIONS, Inc., et al., Interveners).**

No. 6970.

United States Court of Appeals for the District of Columbia.

Argued Feb. 7, 1938.

Decided April 11, 1938.

Donald R. Richberg, Raymond N. Beebe, and Adrien F. Busick, all of Washington, D. C., and Howard L. Kern and John H. Wharton, both of New York City, for appellant.

Hampson Gary and James A. Kennedy, both of Washington, D. C., for appellee Federal Communications Commission.

Manton Davis, of New York City, Richard A. Ford, of Washington, D. C., and Chester H. Wiggin and Frank W. Wozencraft, both of New York City, for intervener R.C.A. Communications, Inc.

Ralph H. Kimball, of New York City (Francis R. Stark, of New York City, of counsel), for intervener Western Union Telegraph Co.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

EDGERTON, Associate Justice.

Appellant, a Delaware corporation, is a public service radiotelegraph carrier which has repeatedly been licensed by the Federal Communications Commission. It furnishes to the public point-to-point service within the United States, ship-to-shore service, and direct service to four countries in Europe and five in South America. It is a unit in the system of the Mackay Companies, sometimes called the International System. The associated Mackay Radio & Telegraph Company, a California corporation, reaches certain transpacific points. Other units in the system are the Postal Telegraph Land Line System and the Commercial Cable Company.

Appellant applied to the Communications Commission for licenses to operate a direct public radiotelegraph service between its stations on Long Island and the stations of the Norwegian government near Oslo, Norway. In January, 1936, the Commission (Telegraph Division), pursuant to sections 307(a) and 309(a) of the Communications Act of 1934, 48 Stat. 1064–1105, as amended by 49 Stat. 1475, 50 Stat. 56, 189–198, 47 U.S.C.A., §§ 307(a), 309(a), 151–609, held a public hearing to determine whether "public interest, convenience, or necessity would be served" by granting the licenses. On June 3, 1936, it made a negative finding on that question, and denied the applications. The full Commission affirmed the decision and order of the Telegraph Division. Appellant appealed to this court under section 402 of the Communications Act, as amended, 47 U.S.C.A. § 402. R. C. A. Communications, Inc. (hereafter called RCAC) and the Western Union Telegraph Company (hereafter called Western Union) intervened.

Both Western Union and the Commercial Cable Company have cables to England, where their traffic for Norway is transferred to one of several foreign connecting carriers. The French Telegraph Cable Company has cables from New York to France, and there transfers Norwegian traffic to a radio circuit. The appellant handles traffic by radio from the United States to Copenhagen, whence it is forwarded to Norway by connecting carriers. Appellant's traffic to Norway is small, and is carried at a loss. Appellant has no traffic from Norway, as the Norwegian administration has a financial interest in sending messages to the United States by a direct circuit. There is only one direct service, whether by cable or radio, between the United States and Norway; that is the radio circuit operated at the American end by the intervener RCAC, and at the Norwegian end by the Norwegian Department of Telegraphs.

The several carriers handled during the first ten months of 1935 the following percentages of the telegraph business, including radio, between the United States and Norway:

|  | Eastbound | Westbound |
|---|---|---|
| Western Union | 22.93 | 5.32 |
| Commercial Cable Company | 14.44 | 7.03 |
| French Telegraph Cable Company | .94 | .00 |
| Mackay Radio & Telegraph Company, Inc. | 1.01 | .00 |
| RCAC | 60.68 | 87.65 |
|  | 100.00 per cent. | 100.00 per cent. |

Appellant contends that the Commission committed error of law in failing to interpret "public convenience, interest or necessity" as necessarily requiring the licensing of a competing radio circuit to Norway so as to end what appellant describes as the monopoly of RCAC. In Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406, the Supreme Court said: "In granting licenses the commission is required to act 'as public convenience, interest or necessity requires.' This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. * * * The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character, and quality of services." Part of the context is section 1 of the Communications Act, 47 U.S.C.A. § 151, which states that the Commission is created "for the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities at reasonable charges." Nothing is said here about competition and monopoly. Appellant cites sections 311, 313, and 314 of the act, 47 U.S.C.A. §§ 311, 313, 314, as showing that Congress considers competition in radio to be, inevitably, in the public interest. Sections 311 and 313 deny licenses to radio concerns which violate the anti-trust laws. Section 314 forbids the acquisition

of each other's stock, etc., by radio concerns on the one hand and wire-telegraph or cable concerns on the other, with the purpose or effect of substantially lessening competition or restraining commerce, or "unlawfully to create monopoly." To prohibit concerns "unlawfully to create monopoly" is to recognize that monopoly may be lawful, as most public utility monopolies are. These sections do not show, as appellant's argument implies, a congressional belief that two radiotelegraph circuits are necessarily better than one. Such a belief would be as strange as a belief that two telephone systems, or two railroads, are necessarily better than one. It is obvious that two concerns are sometimes worse than one. Sometimes the traffic will not support two; and even when it will, there may be inadequate individual and social compensation for the wastes of duplication. If Congress had had the odd intention of requiring the Commission to issue a second license wherever a first had been issued, Congress could easily have said so.

The Transportation Act of 1920 requires a railroad to obtain a certificate of "public convenience and necessity" before constructing a new line, and a finding of "public interest" before acquiring another line by lease or stock purchase. 49 U.S. C.A. §§ 1(18–22), 5(2), 20a (2).[1] As the Supreme Court intimated in Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406, the meaning of that language throws light on the meaning of "public interest, convenience or necessity" in the Communications Act of 1934. In the New York Central Securities case, New York Cent. Securities Corporation v. U. S., 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, the court sustained orders of the Interstate Commerce Commission, based on a finding of "public interest," which authorized the leasing of the Big Four and the Michigan Central Railroads to the New York Central. The court said: "The term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities." 287 U.S. 12, 25, 53 S.Ct. 45, 48, 77 L.Ed. 138. The purpose of the requirement "is to prevent interstate carriers

from weakening themselves by constructing or operating superfluous lines, and to protect them from being weakened by another carrier's operating in interstate commerce a competing line not required in the public interest." Texas R. R. Co. v. Northside Railway Co., 276 U.S. 475, 479, 48 S.Ct. 361, 362, 72 L.Ed. 661. Congress recognized "that competition between carriers may result in harm to the public, as well as in benefit." Texas & Pacific Railway Company v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 266, 70 L.Ed. 578. "Accordingly, the Commission has denied construction applications where existing services were deemed reasonably adequate, where needless duplication of facilities would result, and where the traffic relied upon would be secured largely at the expense of other roads." Sharfman, Interstate Commerce Commission, Vol. III-A, p. 356.

█ Though the Communications Act forbids the licensing of concerns which violate the anti-trust laws, is does not apply to the radiotelegraph business the policy of free competition, but a contrary policy. Free competition means that all are free to compete. The Communications Act forbids competition by all who cannot prove that their entry will serve the "public interest, convenience or necessity." Appellant does not contend that the Commission must license every one who may wish to conduct a radiotelegraph business with any part of the world. But that conclusion would follow if appellant were right in its premise that the policy of the anti-trust acts is the measure of the Commission's duty. If appellant, and it alone, were licensed to compete with RCAC, all others would be excluded from direct radio communication with Norway. Such a situation would stand, with regard to the anti-trust laws, exactly as the present RCAC "monopoly" stands. Either situation would be illegal if it were brought about, by agreements or other devices, without governmental sanction. An agreement by two concerns to exclude all others from competition is an obvious violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. But either situation is legal when it is brought about legally. The anti-trust laws are aimed at private action, not at governmental action. They do not require the granting of a franchise or license to a second public service

---

[1] Section 5(8) expressly exempts acquisitions under section 5(2) from the operation of the anti-trust laws.

company which wishes to compete with an existing service. As appellant states, it is "a public service radiotelegraph carrier."

Appellant's quotations from reports of the former Radio Commission do not show, as appellant contends, that that Commission believed language in the Radio Act of 1927, 44 Stat. 1162, to require the licensing of competitive radio services wherever the traffic would support them. The quotations show merely that Commission's belief that the statute permitted it to adopt such a policy "for its own guidance." Radio Commission Report for year ended June 30, 1928, p. 30; for period ended Nov. 1, 1929, p. 42. Morever, the statutory language on which appellant relies, which was reproduced in the Communications Act and has been discussed above, will not bear the construction for which appellant contends. For both these reasons, the doctrine that the re-enactment, without change, of statutory language "which had previously received long-continued executive construction, is an adoption by Congress of such construction" (United States v. Cerecedo Hermanos y Compania, 209 U.S. 337, 339, 28 S.Ct. 532, 533, 52 L.Ed. 821), is not applicable.

■ In our opinion, the Commission did not err as matter of law in refusing to treat "public interest, convenience or necessity" as requiring, by definition, the licensing of appellant.

■ Appellant contends that the Commission's findings of fact are not supported by substantial evidence. We are to accept the findings of fact, "if supported by substantial evidence," as "conclusive unless it shall clearly appear that the findings of the Commission are arbitrary or capricious." Communications Act, § 402(e), 47 U.S.C.A. § 402(e). "No longer is the court entitled to revise the commission's decision and to enter such judgment as the court may think just." It "is not concerned with the weight of evidence or with the wisdom or expediency of the administrative action." Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 276, 277, 53 S.Ct. 627, 632, 77 L.Ed. 1166, 89 A.L.R. 406. Cf. Davidson v. Federal Radio Commission, 61 App.D.C. 249, 61 F.2d 401; Telegraph Herald Co. v. Federal Radio Commission, 62 App.D.C. 240, 66 F.2d 220, 223; Eastland Co. v. Federal Communications Commission, 67 App.D.C. 316, 92 F. 2d 467, 471.

The Commission in its "Statement of Facts and Grounds for Decision" finds many specific facts, and concludes (we insert numbers): "Upon careful consideration of all the evidence, the Commission finds that there are (1) adequate radio and cable facilities, (2) keen competition and (3) service with which there is no complaint. The proposed new circuit would not offer (4) new or (5) improved service, (6) reduce rates or (7) create traffic. (8) It would decrease the revenues of all established competing companies except applicant. (9) The establishment of the proposed circuit would mean the practical withdrawal of an associated cable company from competition. (10) The expected increase in revenue to applicant is not shown to be necessary for the continued operation of applicant or of the International System as competing factors in international communication service. (11) The total revenue to the American owned companies, upon which this country must depend for its independent foreign communications system, would be reduced and (12) additional expense incurred (13) without any corresponding benefit to the American people by reduced rates or improved service. In the light of these facts and of the entire record, the Commission finds that public interest, convenience or necessity will not be served by the granting of these applications."

Disregarding (13), which is a restatement of (5) and (6), here are twelve basic findings, each of which tends to support the Commission's adverse conclusion on the ultimate statutory question of "public interest, convenience or necessity." Three of the twelve (1, 2, 3) tend to show that the present situation is satisfactory; five (4, 5, 6, 7, 10) that licensing appellant would not improve the situation; and four (8, 9, 11, 12) that licensing appellant would make the situation worse. Most of these basic findings are in turn supported by other findings of a more detailed character. In our opinion the ultimate finding and the basic findings are suported by substantial evidence.

Appellant contends that the granting of its application would certainly serve the public interest, convenience, or necessity, because of its effect upon competition. As a proposition of law, this contention has been discussed above. As a proposition of fact, is rests logically upon some three premises, express or implied: First that

there is today less competition than the interests of the public require; second that the licensing of appellant would increase competition; and third that this increase would result in more benefit than harm to the public. The evidence might perhaps have supported, but certainly did not require, a finding in appellant's favor on any one of these three points. On each, the record contains substantial evidence to the contrary. First. The evidence in support of the Commission's finding of "keen competition" is not impressive, but it is substantial. The table printed above shows that for the first ten months of 1935 the intervener RCAC had no *radio* competition westward, and very little eastward. On the other hand, the table provides substantial evidence of competition from the cable companies; and a director of the French Telegraph Cable Company expressed opposition to the licensing of appellant, as "the introduction of a new element of competition in a field which is already crowded with competing systems." Appellant argues that competition between radio and cable has no significance for legal purposes. This arbitrary view is not shared by Congress. Section 314 of the Communications Act, 47 U.S.C.A. § 314, is devoted wholly to an effort to maintain competition between radio circuits on the one hand and telegraph and cable lines on the other. Second. If appellant were granted a license to Norway, competition of radio with radio would increase. On the other hand, appellant's associated company, the Commercial Cable Company, would be practically eliminated from competition, since the proposed contract between appellant and the Norwegian administration provides that appellant will transmit over the new radio circuit, unless otherwise routed by the sender, all messages received by any of the companies in appellant's system, which includes both Postal Telegraph and Commercial Cable. Therefore, the licensing of appellant would practically eliminate, between the United States and Norway, competition of cable with cable, and would sharply reduce competition of cable with radio. Third. It does not appear that these changes in the competitive situation would benefit the public. Appellant has no intention of reducing rates; it would handle all classes of traffic over the proposed circuit at the same rates now charged by all the other carriers. While appellant contends, without dispute, that its direct service over the proposed circuit would be better than its present indirect service via Copenhagen, it does not claim that its service would be better than, or in any way different from, the existing RCAC service. And as the Norwegian administration receives 50 per cent. of the tolls for radio communication, and a much smaller fraction of cable tolls, the Commission properly found that "the total revenue to the American-owned companies, upon which this country must depend for its independent foreign communications system, would be reduced" by the diversion of Commercial Cable traffic to the appellant. Moreover, the record shows that foreign governments sometimes use the entry of a second radio company into the field as a means of forcing both companies to accept more onerous terms, including a smaller division of the tolls, than were previously imposed upon a single company.

Appellant complains of the Commission's finding that: "The expected increase in revenue to applicant is not shown to be necessary for the continued operation of applicant or of the International System as competing factors in international communication service." Though appellant's latest reports, those for 1934 and 1935, showed operating losses, the Commission was not required to accept the declarations of appellant's witnesses that new circuits were necessary. Some evidence to the contrary was furnished by appellant's operating vice president, Mr. Stone. Summarizing his own testimony, he said with regard to the prospects for 1936: "We will be on, as it currently appears, so far as the cash position is concerned, a self-supporting basis, * * * due to a smaller addition to our plant account than in recent years, and in particular 1934; second, reduced expenses, operating and otherwise; and, third increased revenues."

■ Appellant charges that the commission refused to consider evidence in appellant's favor and thus acted arbitrarily and capriciously. The Commission states that it reached its conclusions "upon careful consideration of all the evidence" and "in the light of * * * the entire record." Nothing in the record suggests the contrary. The Commission was under no obligation to recite every item of evidence, or of fact, which had some bearing on the questions before it. Cf. Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. **282, 96 F.2d**

554, decided March 16, 1938. It could not properly incorporate a 1,300-page record. "There is no requirement that the Commission specify the weight given to any item of evidence or fact or disclose mental operations by which its decisions are reached. Useful precision in respect of either would be impossible." Baltimore & O. R. R. Co. v. United States, 298 U.S. 349, 359, 56 S.Ct. 797, 803, 80 L.Ed. 1209. If it was proved, as appellant contends and the Commission does not deny, that appellant could and would give an efficient service, at small additional cost to itself, without causing electrical interference or using additional frequencies, it does not follow that the Commission acted arbitrarily or capriciously in finding that the public interest, convenience, or necessity would not be served by granting the license.

Affirmed.