RCA COMMUNICATIONS, Inc. v. FEDER-
AL COMMUNICATIONS COMMIS-
SION et al.

No. 10951.

United States Court of Appeals
District of Columbia Circuit.

Argued May 20, 1952.

Decided Nov. 6, 1952.
Writ of Certiorari Granted March 9, 1953.

See 73 S.Ct. 650.

John T. Cahill, New York City, of the Bar of the Supreme Court of New York, *pro hac vice,* by special leave of Court, with whom Howard R. Hawkins, New York City, and James E. Greeley, Washington, D. C., were on the brief, for appellant.

Stanley S. Neustadt, Counsel, Federal Communications Commission, New York City, of the Bar of the Supreme Court of New York, *pro hac vice,* by special leave of Court, with whom Benedict P. Cottone, General Counsel, Federal Communications Commission, and Richard A. Solomon, Acting Assistant General Counsel, Federal Communications Commission, Washington, D. C., were on the brief, for appellee. Max Goldman, Assistant General Counsel, Federal Communications Commission, Washington, D. C., also entered an appearance for appellee.

James A. Kennedy, New York City, with whom John A. Hartman, Jr., New York City, and Burton K. Wheeler, Washington, D. C., were on the brief, for the intervenor.

Before EDGERTON, PRETTYMAN, and BAZELON, Circuit Judges.

EDGERTON, Circuit Judge.

This appeal is from a decision and order of the Federal Communications Commission, two Commissioners dissenting, which granted applications of the present intervenor, Mackay Radio and Telegraph Company, Inc., (Mackay), a public-service radiotelegraph carrier, for modification of its license so as to authorize it to operate, in competition with appellant RCA Communications, Inc., (RCAC), direct radiotelegraph circuits between the United States and the Netherlands and between the United States and Portugal. Since we declined to stay the Commission's order pending this appeal Mackay's proposed operations and arrangements may probably have come into actual effect. However that may be, we shall call them "proposed" because we have to discuss the situation that existed when the Commission entered its order.

Mackay is a wholly-owned subsidiary of American Cable and Radio Corporation (AC&R), which also owns The Commercial Cable Company (Commercial) and All America Cables and Radio, Inc., (All America). International Telephone and Telegraph Corporation owns a majority of the capital stock of AC&R. At the time of the Commission's hearing Mackay operated licensed radiotelegraph circuits to about 40 foreign points. It handled very little Portuguese traffic and this only indirectly, by relay through an All America radio station in Peru. It handled almost no Netherlands traffic.[1]

Appellant RCAC, a party to the proceeding before the Commission, is a wholly-owned subsidiary of Radio Corporation of America. It operates[2] licensed radiotelegraph circuits to about 65 foreign points. It operates direct radiotelegraph circuits between the United States and the Netherlands and also between the United States and Portugal. At the time of the Commission hearing no other carrier did so.

Both Commercial and Western Union Telegraph Company (Western Union) furnish cable service between the United States and European points.[3] Commercial owns cables between New York and Eire. Its Netherlands traffic is relayed from Eire to London and retransmitted to Rotterdam over leased facilities. Traffic to Portuguese points routed via Commercial is sent over owned and leased cables to the Azores, where it is relayed to Lisbon over foreign cables. Western Union has cables to England, whence traffic is forwarded to Amsterdam through connecting cables and land-lines. Western Union messages destined for Portugal are transmitted in basically the same way as Commercial's.

RCAC's radiotelegraph circuit between New York and Amsterdam is operated in conjunction with the Netherlands Administration of Posts, Telephones, and Telegraph. Mackay's proposed contract with the same correspondent provides that the Netherlands Administration will turn over to Mackay a proportion of its westbound traffic to the United States equal to Mackay's proportion of the total eastbound radio traffic sent to the Netherlands by

1. In 1947, the latest year covered by the record, telegraph traffic of all sorts between the points involved in this case was distributed as follows:

|  | The Netherlands | | Portugal | |
|---|---|---|---|---|
|  | East-bound | West-bound | East-bound | West-bound |
| Commercial (cable) | 22.7% | 17.3% | 6.5% | 2.5% |
| Western Union (cable) | 47.4% | 29.8% | 36.3% | 13.9% |
| RCAC (radio; direct) | 29.8% | 52.8% | 51.4% | 80.7% |
| Mackay (radio; indirect) | 0.1% | 0.1% | 5.8% | 2.9% |
|  | 100 % | 100 % | 100 % | 100 % |

2. Throughout this opinion, statements of fact in the present tense usually refer to the time of the Commission's hearing.

3. Western Union participated in the Commission hearing but did not intervene here.

all United States radiotelegraph carriers. Mackay will guarantee that at least 50% of AC&R-controlled traffic to the Netherlands will be transmitted by radiotelegraph. In order to meet this commitment AC&R will divert from Commercial to Mackay all unrouted non-Rotterdam Netherlands traffic. The Commission estimates that as a result of the agreement approximately 50% of Commercial's eastbound traffic will be diverted to Mackay.

Similarly, in the case of Portugal, Mackay proposes to deal with Portuguese Marconi, which is the RCAC correspondent. Portuguese Marconi will follow the same formula as the Netherlands Administration in determining the amount of westbound traffic to be given Mackay, and the AC&R system will transmit by Mackay and Marconi its unrouted eastbound traffic. The Commission estimates that 25% of Commercial's traffic will be thus diverted to Mackay.

The Commission found among other things:[4] (1) Existing telegraph facilities (cable plus radio) are in excess of those required to handle present and expected traffic. (2) Mackay's proposed operations will redistribute present traffic rather than generate any appreciable amount of new traffic. (3) "It does not appear that Mackay's proposed service to each of the points at issue will result in lower rates or speedier service, or will otherwise be superior to or more comprehensive than the service now available via RCAC." (4) There is some possibility that Mackay will need additional frequencies, for Netherlands traffic, to provide continuous service throughout the eleven-year sunspot cycle. (5) Both Mackay's revenue and its expenses will be increased, but the net result will be financially beneficial to Mackay and to the AC&R system of which it is a part. (6) The revenue of other carriers will be reduced, but their expenses will not. (7) "When the over-all effect of a grant of the applications is considered, it appears that the added costs which might result on an industry-wide basis will be relatively small so that the impact on the rate structure

as a whole should not be substantial." (8) Mackay is technically, financially and legally qualified and able to render adequate service. (9) There is "at present active competition not only between cable carriers and between cable and radiotelegraph carriers serving the points at issue, but also between such telegraph service provided by these carriers and the airmail and the radiotelephone services." Granting Mackay's application (10) will "not endanger the ability of RCAC and Western Union to continue to provide competitive service either to the points at issue or, generally, in the field of international telegraph communications"; (11) "while resulting in some decrease in cable competition, will increase over-all competition for telegraph traffic generally * * *"; and (12) will "introduce competition between direct radiotelegraph circuits" and consequently "more effective competition between radiotelegraph carriers". The "ability of a carrier to provide direct communication service is an important factor in appealing for customer patronage * * *."

The Commission was "of the opinion that in those instances where there is only one direct radiotelegraph circuit to a point, [the Commission] should authorize a second competing radiotelegraph circuit where the applicant demonstrates that such competition is reasonably feasible". Finding it feasible here, the Commission granted Mackay's applications.

The record supports the Commission's basic findings that we have numbered (1) to (12) with the possible exception of the statement in (11) about "over-all competition", and we shall assume it supports that finding also. It may follow that, as the Commission thought, the proposed competition is reasonably feasible. But that is not the question. The Communications Act authorizes the Commission to grant licenses only if it "shall determine that public interest, convenience, or necessity would be served by the granting thereof * * *." 47 U.S.C.A. § 309. The Commission did so determine here. But we agree with the dissenting Com-

4. The numbering and sequence are ours.

missioners that the Commission's basic findings do not support this determination.

The Commission said "The question before us herein of whether duplicate radiotelegraph circuits should be authorized is very similar, if not the same, as that which was before this Commission in connection with the Oslo case." We agree. In this case as in the Oslo case the question before the Commission was whether a duplication that would do the public little harm [5] and no good,[6] but was feasible and would create competition, met the statutory standard of "public interest, convenience, or necessity". But in the Oslo case the Commission decided this question the other way and we affirmed its decision. Mackay Radio & Telegraph Co. v. Federal Communications Commission, 68 App.D.C. 336, 97 F.2d 641. In that case it appeared that RCAC carried about 60% of eastbound and 88% of westbound telegraph traffic (radio plus cable) between the United States and Norway. Commercial and Western Union carried, by cable, practically all the rest. And there was "only one direct service, whether by cable or radio, between the United States and Norway; * * * the radio circuit operated at the American end by the intervener RCAC, and at the Norwegian end by the Norwegian Department of Telegraphs." 68 App.D.C. at page 337, 97 F.2d at page 642. Mackay applied to the Commission for a license to operate a direct radiotelegraph circuit to Norway. But the Commission found among other things that there were "adequate radio and cable facilities, keen competition, and service with which there is no complaint. The proposed new circuit would not offer new or improved service, reduce rates, or create traffic * * *. The total revenue to the American owned companies * * * would be reduced and additional expense incurred." In the Matter of Mackay Radio & Telegraph Company, Inc., 2 F.C.C. 592, 600. Accordingly the Commission decided that a grant of Mackay's application would not serve the public interest, convenience, or necessity. In affirming that decision we observed that the Communications Act does not show "a congressional belief that two radiotelegraph circuits are necessarily better than one. Such a belief would be as strange as a belief that two telephone systems, or two railroads, are necessarily better than one. * * * Though the Communications Act forbids the licensing of concerns which violate the anti-trust laws, [it] does not apply to the radiotelegraph business the policy of free competition,[7] but a contrary policy. * * * [It] forbids competition by all who cannot prove that their entry will serve the 'pubic interest, convenience or necessity.' " 68 App. D.C. at page 338, 97 F.2d at page 643.

Neither Congress nor the Supreme Court has limited the effect of the Oslo case, though Congress was promptly asked to do so. We decided the case April 11, 1938. Beginning May 2, 1938, a subcommittee of the Senate Committee on Interstate Commerce held hearings, in which the Oslo decision was discussed, on a bill, S. 3875, that proposed to amend § 313 of the Communications Act, 47 U.S.C.A. § 313, by adding: " 'It is hereby declared to be the intention and policy of the Congress to prevent monopoly and to encourage competition in direct foreign radio telegraph communication; and, for the purposes of this act, in considering applications for licenses to engage in direct foreign radio telegraph communications, or applications for modifications or renewals of such licenses, the Federal Communications Commission shall consider competition in such communication to be in the public interest.' "[8] It was brought out at the hearing that the Commission had reported to Congress on February 5, 1935: "Competition has its worst effects in the field of foreign communication. Communications in most foreign countries are handled as a monopoly. Where the monopoly has two competing American companies offering to establish circuits, it can drive progressively harder

5. Findings 7 and 10 above.

6. Findings 1, 2, and 3 above.

7. We do not imply that the Commission has applied a policy of "free" competition in the present case. It has not.

8. Hearings on S. 3875, 75th Cong., 3d Sess., p. 1.

698

bargains to the detriment of American interests."[9] S. 3875 was not enacted.

We think McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544, on which the Commission places some reliance, confutes rather than supports its present theory. The Court there sustained orders of the Interstate Commerce Commission authorizing consolidation of seven large motor carriers. The Court said: "The history of the development of the special national transportation policy suggests * * * that the policies of the anti-trust laws determine 'the public interest' in railroad regulation only in a qualified way. And the altered emphasis in railroad legislation on achieving an adequate, efficient, and economical system of transportation through close supervision of business operations and practices rather than through heavy reliance on the enforcement of free competition * * * has its counterpart in motor carrier policy. * * * Congress recognized there may be occasions when 'competition between carriers may result in harm to the public, as well as in benefit; and that when a [carrier] inflicts injury upon its rival, it may be the public which ultimately bears the loss.'" 321 U.S. at pages 83–84, 64 S.Ct. at pages 378–379. Legislative history suggests that the Communications Act was intended to apply the same principles as the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.[10]

In its present decision the Commission pointed to the large increase in international telegraph traffic and the "strong trend" from cable to radio since it decided the Oslo case in 1936. No doubt such changes make duplication of radio circuits more feasible, but they do not show that competition in this regulated public-utility industry will benefit the public. The Commission said: "Competition can generally be expected to provide a powerful incentive for the rendition of better service at lower cost. Those seeking patronage of customers are spurred on to install the latest developments in the art in order to improve their services or products, and in order to enable them to reduce expenses and thereby lower their rates or prices. The benefits to be derived from competition should, therefore, not be lightly discarded." This argument in favor of the Commission's general theory is not a finding that the specific competition here in issue will produce better service or lower rates or any other public benefit. Any implication that benefit will result is contradicted by the Commission's finding (3) above. The Commission's brief on this appeal speaks in general terms of "long range" benefits of competition. But in deciding this case the Commission made no finding that long range benefits would result from its grant to Mackay, and nothing in its basic findings would have supported such a conclusion. Its unqualified finding (3) is broad enough to contradict such a conclusion. The Commission pointed out that it has licensed duplicating radiotelegraph circuits to foreign countries in a number of instances and has renewed such licenses. But it did not say what benefits, or that any benefits, have resulted in any instance.[11]

Section 314 of the Communications Act, 47 U.S.C.A. § 414, is devoted, as we said in the Oslo case, "wholly to an effort to maintain competition between radio circuits on the one hand and telegraph and cable lines on the other." 68 App.D.C. at page 340, 97 F.2d at page 645. In the present

9. Ibid., p. 34.

   In its present decision the Commission concedes there may be some danger of this sort but points out that it "has statutory authority, particularly in connection with its consideration of applications for renewal of licenses, which would enable it to take the appropriate action in those cases where a carrier persisted in making concessions which were seriously detrimental to the interests of the United States industry."

10. 73d Cong., 2d Sess., Sen.Rep.No.781.

11. A footnote in the Commission's brief states that "in the field of international telegraph communications, which is competitive, rates during the period from the beginning of the last war have not gone up nearly as much as rates in the domestic telegraph and intrastate telephone industries, which are, for all practical purposes, non-competitive. See R. 3857; In the Matter of the Western Union Telegraph Co., 11 F.C.C. 263."

case the Commission found that granting Mackay's applications will "not result in such substantial reduction of competition between cable and radio, or in the creation of a monopoly, so as to bring the AC&R system companies, and particularly Mackay, into violation of Section 314 of the Communications Act." We need not consider whether in our opinion the record supports this conclusion.

Reversed.

PRETTYMAN, Circuit Judge (dissenting).

I disagree with my brethren in this matter.

The facts are comparatively simple. The case concerns cable and radio between the United States and The Netherlands and Portugal. Five companies are involved. RCAC is independent of the other companies involved and has the only direct radio circuit between New York and The Netherlands and between New York and Portugal. Western Union is independent of the other companies and has cables, owned or leased, from New York to The Netherlands and (via British pick-up) to Portugal. The Commercial Cable Company and Mackay are wholly-owned subsidiaries of the American Cable & Radio Corporation, called AC&R. Commercial has cables between New York and The Netherlands and from New York to Portugal, both services being via retransmission or British pick-up. Mackay gets a portion of the Portugal business indirectly through a circuit via Lima. In summary, therefore, there are one direct radio service and two cable services to The Netherlands and to Portugal; and one other indirect radio service to Portugal.

The Commission proposes to grant Mackay a direct radio circuit to The Netherlands and one to Portugal.[1]

The Commission found, on the one hand, that there is ample business to justify another radio carrier and that another carrier would not endanger the financial stability or the service of the carriers now operating; and it found, on the other hand, that the capacity of existing facilities is in excess of that required to handle the expected volume of traffic, that the new service would not result in lower rates or speedier service except that the new service would be superior to the present cable service, and that the new service would result in a reduction of the revenues of RCAC and Western Union but would not reduce their expenses. It further found that the radio business which would go to Mackay would largely be drawn from the cable business of Commercial and that there would be some diversion from RCAC and Western Union.

On the basis of the foregoing findings, the problem reduces itself to (1) whether the Commission can authorize a competitive service as a matter of policy where one is not actually needed and (2) whether the contemplated diversion of traffic from the cables of Commercial to the radio of Mackay would violate Section 314 of the statute.

RCAC says, principally, that the common carrier concept, applicable in railroad, etc., regulation, applies here and that the new service cannot be authorized unless a public need for it is affirmatively proved. The Commission says that competition, whenever it is "reasonably feasible" is part of the public interest, convenience and necessity. By "reasonably feasible" the Commission seems to mean that the new service will not endanger the old.

I think that, when existing traffic permits more than one carrier, and where the existence of a second carrier would not endanger the stability or the service of the existing carrier, competitive service may well be in the public interest. If that be so, then, where the necessary conditions are established, the question whether there should or should not be a second carrier is for the Commission to decide.

The point is brought into sharp focus by the discussion of the so-called Oslo case.[2]

---

1. The order also includes an indirect service to Amsterdam via Tangier, but that grant does not figure separately in the argument.

2. Mackay Radio & Tel. Co. v. Federal Communications Comm., 1938, 68 App. D.C. 336, 97 F.2d 641.

In that case, under somewhat similar facts, Mackay applied for a license to operate to Oslo, Norway. The Commission denied the application. Mackay contended that the public convenience *necessarily required* competing service. This court affirmed the Commission, holding that competition is not necessarily or inevitably in the public interest. As I read the opinion we did not hold that competition is not in the public interest.

I hesitate to disagree with the author of the Oslo opinion, who is also the author of the present opinion of the court, as to what the court held in that case. He says that in that case we affirmed a decision the other way on the very question now before us. But it seems to me clear that the question there and the question here were not the same but were two distinct questions.

The controlling basic principle of public utility regulation is the public interest, convenience and necessity. That requires, in a nutshell, efficient service at reasonable rates. That, in turn, requires a financially sound operator and at the same time denies him exorbitant profits. Hence it follows that, if there be between two points traffic enough to support only one efficient operator and supply him with no more than reasonable profits, the public interest requires that only one operator be licensed. Two operations dividing business sufficient only for one will inevitably result in poor service. On the other hand, if there be enough traffic to support two efficient operators and supply both with reasonable profits, it may well be that the public interest requires the injection of an element of competition into the situation. Given business enough for two operators, some competition in service may well increase the standards of both and thus be in the public interest. These principles have been the guides for certification by the Interstate Commerce Commission. I need not delay this case to exhaust the authorities. I cite a few in the footnote.[3] The point is clearly contained in the declaration of the national transportation policy in the statute.[4] It is agreed that the principles of Interstate Commerce Commission regulation apply to the regulation of common carrier communication under the present statute.[5]

In the Oslo case, supra, the question was whether competition is always necessarily in the public interest. The answer was "No". I agree with that answer to that question. The question here is whether competition is ever in the public interest. The answer, it seems to me, is "Yes". The nub of the matter is the amount and nature of the available and prospective business. If the business will support two operators, the regulatory authority has a wide discretion in determining whether to serve the public interest by drastic supervision of a single operator or to install an automatic self-regulator in the form of a competitor.[6]

3. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 80–88, 64 S.Ct. 370, 88 L.Ed. 544, particularly footnotes 9–24; Texas & Pac. Ry. v. Gulf, Etc., Ry., 1926, 270 U.S. 266, 277, 46 S.Ct. 263, 70 L.Ed. 578; Chesapeake & Ohio Ry. Co. v. United States, 1931, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824; Interstate Commerce Comm. v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051; American Trucking Ass'n v. United States, 1945, 326 U.S. 77, 86, 65 S.Ct. 1499, 89 L.Ed. 2065; N. Y. Central Securities Corp. v. United States, 1932, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; Clarke v. United States, D.C.D.C.1951, 101 F.Supp. 587; Hudson Transit Lines v. United States, D.C.S.D. N.Y.1948, 82 F.Supp. 153, affirmed 1949, 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485;

Norfolk Southern Bus Corp. v. United States, D.C.E.D.Va.1950, 96 F.Supp. 756, affirmed, 1950, 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590; Lang Transp. Corporation v. United States, D.C.S.D.Cal.1948, 75 F.Supp. 915; C. E. Hall & Sons v. United States, D.C.Mass.1950, 88 F.Supp. 596. See also Sharfman, The Interstate Commerce Commission, Part III-A, pp. 355–359 (1935).

4. 54 Stat. 899 (1940), 49 U.S.C.A. preceding § 1.

5. 48 Stat. 1066 (1934), 47 U.S.C.A. § 153 (h); Sen.Rep. No. 781, 73rd Cong., 2d Sess.

6. United States v. Pierce Auto Freight Lines, 1946, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821.

In the present case the Commission made extensive findings, which I have summarized. They were amply supported in the record. They in turn support the ultimate finding that the competition of Mackay will not imperil the financial stability of RCAC. And that finding is ample support for the exercise of the judgment of the Commission that the presence of Mackay in the field will serve the public interest.[7]

RCAC also argues that the proposed grant to Mackay would be in violation of Section 314 of the Communications Act.[8] It is not necessary for the court, in the view it takes of the case, to consider that point. But, since I would affirm the Commission on the first question, above described, I have to consider the Section 314 point. That section, in pertinent part, provides: " * * * no person engaged * * * in the business of transmitting * * * for hire * * * communications * * * by radio * * * shall * * * acquire * * * or operate any cable * * * between any place in any State * * * and any place in any foreign country * * * if * * * the purpose is and/or the effect thereof may be to substantially lessen competition or to restrain commerce * * * or unlawfully to create monopoly in any line of commerce; * * *." The section also contains a converse provision prohibiting cable operators from owning or operating radio stations, etc.

It is shown in the record that if these radio circuits be licensed to Mackay some of the cable business of its sister company (Commercial) will be diverted to it. RCAC argues that this is a lessening of competition and a restraint of commerce in flat violation of Section 314.

Section 314, it must be noted, does not prohibit all common ownership of radio and cable. It prohibits such ownership when certain conditions exist, that is, when the purpose or effect is substantially to lessen competition, to restrain commerce, or to create a monopoly. Certainly complete common ownership removes subsidiaries from competition with each other. If Section 314 be construed to prohibit a lessening of competition between sister companies regardless of other circumstances, the conditions specified in the section become meaningless and superfluous. So construed the section would flatly prohibit all common ownership of radio and cable operations, which it obviously does not do. The section must have been aimed at some condition or tendency other than those inherent in common ownership as such. It must have been aimed at a lessening of competition discernible in the circumstances of the specific situation, in addition to the bare fact of common ownership. This idea is supported by the fact that, although it was known to the committees of Congress that Mackay and Commercial were under common ownership when the Communications Act of 1934 was under consideration, no unconditional prohibition of continued common ownership appears in that Act.

After the hearing but before the decision in the present case, the Commission had before it in another case, known as Docket 9093, the question whether the operation of Mackay (radio) and Commercial (cable) in common ownership violated Section 314. That proceeding was devoted to that question. After a full hearing, to which our present appellant, RCAC, was a party, and extensive findings, the Commission concluded that, while the Section applied, the ownership, control and operation of the companies within this system (AC&R) did not violate the section. The Commission referred, *inter alia multa,* to the fact that Mackay, a part of a radio-cable system since 1929, had been granted "an increasing number" of radio circuits to points in Europe during many years, prior and subsequent to the passage of the Act. In this connection it is significant that, despite the grant to Mackay of numerous duplicating circuits in the years 1936–1947, RCAC actually handled a larger proportion of the total international telegraph traffic in 1947 than it did in 1936; 31.7 per cent as com-

7. Chesapeake & Ohio Ry. v. United States, 1931, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824.

8. 48 Stat. 1087 (1934), 47 U.S.C.A. § 314.

pared with 20.6 per cent. It is also significant in this connection that the record shows that international telegraph rates, competitive, have not increased as much as domestic rates, for all practical purposes non-competitive. The decision in Docket 9093, rendered in May, 1950, was not appealed, was not encompassed in the appeal here, and is not before us.

Three considerations, principally, lead me to the conclusion reached by the Commission upon the Section 314 point. 1. Before this application there was a competitive situation between radio and cable services by the several companies in respect to Netherlands and Portugal business. It was a three-cornered competition. Western Union offered cable, RCAC offered radio, and AC&R offered cable. That competition will not be changed substantially by the grant of a radio circuit to AC&R. Western Union will still seek cable business. RCAC will still seek radio business. AC&R will certainly still seek cable business in the public market. There is nothing to show that it intends to shut down Commercial; rather the natural assumption is that in view of its agreement with The Netherlands Administration it will be a more acute seeker for cable business. It does not appear that the competition between cable and radio as presently offered by the three companies will be lessened by the grant of a radio circuit to AC&R. Upon the basis of exhaustive studies and findings the Commission reached that conclusion. It is clearly correct.

As a matter of fact appellant RCAC does not rest its case upon a claim of a lessening of inter-company competition. It rests upon an intra-company shifting of business within the AC&R system.

2. If it be determined, as it has been (in Docket 9093), that the present operation of Mackay and Commercial in common ownership does not violate Section 314, I do not see how a shift of business from one twin to the other would lessen competition between them. There is no substantial competition between them now; there never— or hardly ever—is between twin subsidiaries. The present allocation of business between them is not the result of competi-

tion between them; it is the result of either parent's policy or customer requirement. A change in the parent's policy, which is what the proposed agreement is, is not a lessening of existing competition. So, if the common ownership in this case does not violate the section, a mere change in business allocation as between the non-competing twins would not violate it.

3. Section 314 embodies a portion of antitrust policy, specifically provided by the immediately preceding Section 313. The Commission was entitled to look at the whole picture in formulating its judgment as to the public interest. Thus viewed this grant of a radio circuit to Mackay certainly tends to serve the purposes of the statute. RCAC now enjoys a monopoly in radio between the places here involved. Mackay, by this grant, would introduce competition, would reduce restraint on commerce, and would destroy instead of create monopoly. The Commission thought these broader considerations pertinent and important. I think so too.

I think the decision of the Commission should be affirmed.