632

DELTA AIR LINES, INC., Petitioner

v.

CIVIL AERONAUTICS BOARD,

Respondent,

City of Nashville and The Nashville Chamber of Commerce, City of Tampa, Florida, and The Greater Tampa Chamber of Commerce, City of Kansas City, Missouri, City of St. Louis, Missouri, and The Chamber of Commerce of Metropolitan St. Louis, Trans World Airlines, Inc., Eastern Air Lines, Inc., Intervenors.

AMERICAN AIRLINES, INC., Petitioner

v.

CIVIL AERONAUTICS BOARD,

Respondent,

City of Tampa, Florida, and The Greater Tampa Chamber of Commerce, City of Kansas City, Missouri, City of St. Louis, Missouri, and The Chamber of Commerce of Metropolitan St. Louis, Trans World Airlines, Inc., Eastern Air Lines, Inc., Intervenors.

EASTERN AIR LINES, INC., Petitioner

v.

CIVIL AERONAUTICS BOARD,

Respondent,

City of Tampa, Florida, and The Greater Tampa Chamber of Commerce, City of Kansas City, Missouri, City of St. Louis, Missouri, and The Chamber of Commerce of Metropolitan St. Louis, Trans World Airlines, Inc., Delta Air Lines, Inc., Intervenors.

NATIONAL AIRLINES, INC., Petitioner

v.

CIVIL AERONAUTICS BOARD,

Respondent,

City of Tampa, Florida, and The Greater Tampa Chamber of Commerce, City of Kansas City, Missouri, City of St. Louis, Missouri, and The Chamber of Commerce of Metropolitan St. Louis, Trans World Airlines, Inc., Intervenors.

Nos. 14798, 14804, 14812, 14822.

United States Court of Appeals District of Columbia Circuit.

Dec. 10, 1959.

Mr. Joseph J. O'Connell, Jr., Washington, D. C., with whom Messrs. Robert Reed Gray and James W. Callison, Washington, D. C., were on the brief, for Delta Air Lines, Inc., petitioner in No. 14798 and intervenor in No. 14812.

Mr. Howard C. Westwood, Washington, D. C., with whom Messrs. Peter S.

Craig and J. William Doolittle, Jr., Washington, D. C., were on the brief, for petitioner in No. 14804.

Mr. Harold L. Russell, Atlanta, Ga., with whom Messrs. E. Smythe Gambrell and W. Glen Harlan, Atlanta, Ga., were on the brief, for Eastern Air Lines, Inc., petitioner in No. 14812 and intervenor in Nos. 14798 and 14804.

Mr. Richard A. Fitzgerald, Washington, D. C., with whom Messrs. John W. Cross and Andrew T. A. MacDonald, Washington, D. C., were on the brief, for petitioner in No. 14822.

Mr. O. D. Ozment, Asst. Gen. Counsel, Litigation and Research, Civil Aeronautics Board, with whom Mr. Franklin M. Stone, General Counsel, Civil Aeronautics Board, Mr. John H. Wanner, Associate General Counsel, Civil Aeronautics Board, Mr. Robert L. Toomey, Attorney, Civil Aeronautics Board, and Mr. Richard A. Solomon, Attorney, Department of Justice, were on the brief, for respondent. Messrs. Monte Lazarus and Morris Chertkov, Attorneys, Civil Aeronautics Board, and Mr. Daniel M. Friedman, Attorney, Department of Justice, also entered appearances for respondent.

Mrs. Dorothy F. Fardon, Kansas City, Mo., with whom Messrs. Dick H. Woods, Kansas City, Mo., and J. Parker Connor, Washington, D. C., were on the brief, for intervenor City of Kansas City, Missouri.

Mr. Aloys P. Kaufmann, St. Louis, Mo., of the bar of the Supreme Court of Missouri, pro hac vice, by special leave of court, for intervenors City of St. Louis and Chamber of Commerce of Metropolitan St. Louis. Messrs. Hugh Lynch, Jr., Charles E. Channing, Jr., and Edward J. Gorman, Jr., Washington, D. C., also entered appearances for intervenors City of St. Louis, Missouri, and Chamber of Commerce of Metropolitan St. Louis.

Mr. James K. Crimmins, New York City, with whom Mr. Warren E. Baker, Washington, D. C., was on the brief, for intervenor Trans World Airlines, Inc. Mr. William Caverly, Washington, D. C., also entered an appearance for intervenor Trans World Airlines, Inc.

Mr. Robert E. Redding, Silver Spring, Md., was on the brief for intervenors City of Nashville and Nashville Chamber of Commerce in No. 14798.

Mr. Ralph A. Marsicano, Tampa, Fla., entered an appearance for intervenors City of Tampa, Florida, and the Greater Tampa Chamber of Commerce.

Before PRETTYMAN, Chief Judge, and BAZELON and FAHY, Circuit Judges.

PRETTYMAN, Chief Judge.

These are four petitions for review of orders of the Civil Aeronautics Board made in its St. Louis-Southeast Service Case. Principally the Board awarded to Trans World Airlines, Inc. (TWA) a new route from St. Louis to Miami and other Florida coast points, and to Delta Air Lines, Inc., a new Memphis-Birmingham route.

The cases in this court fall into two main parts, one relating to each of the above-mentioned awards. The discussion, however, more aptly falls into four divisions: (I) The mutual-exclusivity contentions advanced by American, Delta and National. These carriers claim that TWA was awarded an effective southern transcontinental route without consideration of economically mutually exclusive applications. (II) Impact of the award to TWA on an existing southern transcontinental interchange arrangement. (III) Eastern's contentions concerning mutual exclusivity. Eastern claims that the Board erroneously made awards to TWA and Delta without comparative consideration of its mutually exclusive applications. (IV) The merits of the TWA and Delta awards, apart from mutual-exclusivity arguments, and some miscellaneous contentions.

I

Two proceedings before the Board play parts in this problem. One is the St. Louis-Southeast Service Case, which was instituted to inquire into the need for service "between St. Louis on the one

hand and Florida and other southeastern points on the other". Several applications were consolidated in that case.[1] As we have noted, the orders here under review were entered in that proceeding. The other case which plays a part in the contentions made to us is known as the Southern Transcontinental Service Case. It was a combination of several proceedings, which initially had various names. In its order of consolidation in the Southern Transcontinental Case [2] the Board delineated the scope of the proceeding to include (1) the need for single-carrier service between Houston and West Coast points, (2) the need for "single-carrier transcontinental service" between Florida points and the West Coast, and (3) the need for single-carrier transcontinental service between Atlanta-Birmingham and the West Coast. In that order the Board repeatedly used the expression "southern transcontinental route". The Board explained that in prescribing the scope of this hearing it intended to consider new or additional through service in the southern tier of states, that is, from Florida across the southern boundary of the country to and including California. The Board said in that connection: " * * * it is necessary to establish a framework in which all major southern transcontinental service issues as a whole can be determined for the foreseeable future." As thus arranged, the case included a large number of applications.

In the St. Louis Case various preliminary motions were made by different carriers, which motions fall generally into two classes. The first class was for expansion of the proceeding to include applications for extensions westward of existing routes into St. Louis from the East, so as to add to them routes from St. Louis to the West Coast, and in the opposite direction for extensions eastward of existing routes into St. Louis from the West, so as to add to them routes from St. Louis to the Southeast. These motions were denied. The other class of motions was to impose restrictions upon any grant of a new route from St. Louis to Florida points, so as to prevent any grant of such a route from being in effect a through service Florida-California via St. Louis. In response to these motions the Board announced as a minimum restriction a requirement that service on any route granted between California points and Florida points via St. Louis must include a stop at St. Louis. And the Board further announced that the parties would not be foreclosed from advancing in the course of the hearing appropriate evidence which might reflect a necessity for more stringent limitations. Thus the Board limited the hearing in the St. Louis Case to service between St. Louis and Florida and other Southeast points.

The Board awarded to TWA the route from St. Louis to Florida points [3] and imposed as the sole limitation the previously described mandatory-stop requirement at St. Louis. TWA was already certificated for through service from St. Louis to California coast points, and the new award was cast in the form of an amendment to TWA's existing Route 2, which was the St. Louis-West Coast route. The effect of the order was to authorize one-plane, one-carrier, through service from Florida coast points to California coast points via St. Louis, with a mandatory stop at St. Louis.

The Board made clear that it selected TWA as the awardee of the new route because this selection would provide for the first time single-carrier, single-plane service between the Florida coast and the California coast. For example, the Board pointed out that TWA's service, "operating nonstop from Los Angeles or San Francisco to St. Louis for expedited carriage to the Southeast onward from St. Louis, will provide a usable and con-

1. Order No. E-10304 (May 18, 1956); Order No. E-10651 (Oct. 2, 1956).

2. Order No. E-12861 (Aug. 5, 1958); Order No. E-13132 (Nov. 4, 1958).

3. Order No. E-13026 (Sept. 30, 1958); Order No. E-13248 (Dec. 8, 1958).

venient alternative service to the multiple-stop flights operated by the National-Delta-American Interchange, and bring important service benefits to a respectable portion of the passengers moving in these markets." And in its ruling on a motion for reconsideration the Board said:

> "The TWA award, of course, will permit that carrier to operate a usable one-stop, single-plane service between the West Coast and the points in the Southeast that are being added to its route. It was the carrier's ability to provide these 'beyond area' benefits that was responsible for our selection of TWA as the carrier to perform the *St. Louis-Southeast* services that were found to be required by the public convenience and necessity."

The principal point made by petitioners as to this award is that the Board could not restrict the nature and scope of the St. Louis Case to considerations limited to St. Louis-Florida points service, and then in that same case make an award which was for all practical purposes a one-carrier, one-plane, through transcontinental Florida to California route, when there were pending unheard in another proceeding (the Southern Transcontinental Case) many applications for transcontinental service Florida to California. This argument is premised upon the fact that the route awarded TWA makes its Florida-California service very slightly longer than would be any route which might be awarded in the Southern Transcontinental Case. This method of reaching an award, say the petitioners, is a direct evasion of the Ashbacker doctrine.[4]

The law which was established by the Supreme Court in the Ashbacker case has been sloganized, given a name, and is often discussed as though it were a tech-nicality. The law which the Court there laid down was far from a technicality. The statute involved (the Communications Act) provided in effect that applicants for licenses should have a right to a hearing before their applications are denied. Two applications which were mutually exclusive were pending. The Court held that the Commission could not grant one without a hearing of the other. The Court said, *inter alia:*

> "For if the grant of one effectively precludes the other, the statutory right to a hearing which Congress has accorded applicants before a denial of their applications becomes an empty thing."[5]

The ruling was a practical conclusion of sound common sense. It is simply a realistic truth that, if only one of several applications can be granted, an award to one applicant is as effective a denial of all the others as would be a flat order of denial.

■ The foregoing conclusions were premised upon a physical mutual exclusivity of two licenses. It is true, as the Board argues, that the application of the Ashbacker doctrine to awards of airplane routes presents many difficulties not in the radio cases. We pointed this out in Eastern Air Lines v. Civil Aeronautics Board.[6] We now iterate the doctrine there stated; the Board must have a considerable measure of discretion in limiting the areas to be considered in its air-route cases. But at the same time we emphasize that the Board cannot, either intentionally or by the demonstrable effect of an order, avoid what is now known as the Ashbacker doctrine.

■ Another general doctrine, based upon economic considerations, is pertinent to the present case. In many fields, including both communications and air transportation, an operating license requires a preliminary finding of public

---

4. Ashbacker Radio Co. v. Federal Communications Comm'n, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

5. Id., 326 U.S. at page 330, 66 S.Ct. at page 150.

6. 100 U.S.App.D.C. 184, 243 F.2d 607 (1956), cited and quoted in Eastern Air Lines v. Civil Aeronautics Board, 101 U.S.App.D.C. 156, 247 F.2d 562 (1957).

interest, convenience and necessity.[7] The public interest requires service for the public. It therefore requires that, if there be only enough business to support operation by one licensee, there must be only one licensee. This is a commonplace of public utility regulation. We discussed the principle at length in Carroll Broadcasting Co. v. Federal Communications Comm'n.[8]

■■ The Civil Aeronautics Act[9] requires notice and hearing on applications for certificates for new routes, and also requires notice and hearing upon petitions for modifications of existing licenses, which latter include extensions of existing routes.[10] Under the Act (Sections 401(d) (1) and 401(h) )[11] a finding of public convenience and necessity is a requirement for either the grant of a new certificate or the extension of an existing route. So the principles we have been discussing apply to air certifications. If the grant of one of several applications for a new route does, as a matter of economic necessity, preclude the grant of any other application, the doctrine of Ashbacker clearly applies.

Likewise, if the foreseeable traffic would support two carriers and there are, let us say, five applicants, the grant of any one is an effective denial of three of the remaining four applications, and Ashbacker applies.

The Board denies the applicability of Ashbacker in this latter situation and refers us to Pauley v. Federal Communications Comm'n.[12] However that case involved neither a grant nor a denial of an application and thus is not remotely pertinent to the situation now before us.

■■ The doctrine of Ashbacker also applies where a request for an extension of an existing route would preclude the grant of other pending applications for the entire route. If one certificate for a route exists, and if the grant of a second competitive route would as a matter of economic fact destroy or substantially reduce the rendition of the service required by the public interest, the public interest precludes the competitive grant. The Board has frequently recognized and applied this latter rule; as a matter of fact it almost always does so.[13]

---

7. As to air transportation, Sec. 401(d) (1), Civil Aeronautics Act, 52 Stat. 987 (1938). The Federal Aviation Act of 1958, which supersedes the Civil Aeronautics Act, contains the same provision, Sec. 401(d) (1), 72 Stat. 754, 49 U.S.C.A. § 1371(d) (1).

8. 103 U.S.App.D.C. 346, 258 F.2d 440 (1958). The principle is also discussed at length in the dissent in RCA Communications v. Federal Communications Comm'n, 91 U.S.App.D.C. 289, 294–296, 201 F.2d 694, 699–701 (D.C.Cir.1952), with citations, and is a thread which runs through the opinion of the Supreme Court in that case, Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). This was a telegraph case, in which the competition involved was economic, not a radio case in which the exclusivity is physical. Gerico Investment Co. v. Federal Communications Comm'n, 103 U.S.App.D.C. 141, 255 F. 2d 893 (1958), prior to Carroll, contains a clear intimation to the same effect.

9. Sec. 401(c), 52 Stat. 987 (1938), as reenacted, 49 U.S.C.A. § 1371(c).

10. Sec. 401(h), 52 Stat. 989 (1938), as reenacted, 49 U.S.C.A. § 1371(g). See, e. g., Eastern Air Lines, Inc., et al., Great Lakes to Florida Service, 6 C.A.B. 429 (1945); Delta Air Corp., et al., Service to Atlanta and Brimingham, 2 C.A.B. 447 (1941).

11. Supra notes 7 and 10.

12. 86 U.S.App.D.C. 294, 181 F.2d 292 (D.C.Cir.1950).

13. See, e. g., Southern Transcontinental Service Case and Dallas to the West Service Case, C.A.B. Order No. E–12861 (Aug. 5, 1958); Investigation of Service to Winston-Salem and/or Greensboro-High Point, C.A.B. Order No. E–12873 (Aug. 8, 1958), 1A Av.L.Rep. par. 22,-192; Southern Service to the West Case, Reopened, 18 C.A.B. 234 (1953); Transcontinental & Western Air, Inc., et al., Detroit-Memphis Service, 6 C.A.B. 117 (1944). Cf. Seven States Area Investigation, C.A.B. Order No. E–13254 (Dec. 8, 1958), 1A Av.L.Rep. par. 22,226, 22,-226.11 (new competitive service would be too costly to the Government in subsidies).

This brings us to a consideration of the practicalities of the situation in the case before us. The characteristics of a restricted-area service are entirely different from those of a transcontinental service. This is well recognized in the industry. We think the Board cannot be compelled to expand an area case: but at the same time it cannot be permitted to transform the nature of an area case without applying to it the factors which govern the case as transformed. It cannot hear an area case and, without more, make a transcontinental award. It cannot thus ignore pending applications for a transcontinental route certificate, if those applications are mutually exclusive with the award being made. Petitioners, or some of them, had pending applications for through routes Florida to California coast. These were consolidated in the Southern Transcontinental Case. They endeavored by motions in the St. Louis Case to persuade the Board to do one of two things, either restrict any award in that case so stringently as to preclude its being an effective through southern transcontinental route or give comparative hearing to all pending applications for such a route. They now argue to us that the maximum power of the Board under the statute, construed according to Ashbacker, was limited to these two alternatives. The Board apparently agrees with the general principles underlying these arguments; references to them appear in the orders of consolidation.

So the first debated question is whether a *prima facie* showing was made that the TWA award via St. Louis would create in an inadequate market an effective competitor in the southern transcontinental market. The problem, let us remember, is not whether the award should be made but whether these other applicants were entitled to a hearing on the matter. We think we need go no further than the Board's own findings to secure the answer.

In its initial opinion which supported the order in the proceeding now before us, the Board emphasized that the route to be awarded TWA, involving only 12 per cent circuity over a more direct routing between the Southeast and the West Coast, would provide a convenient alternative service to the existing National-Delta-American Interchange. It noted American's estimate that the new award would divert about 50 per cent of the existing interchange traffic.

In prior proceedings the Board had concluded that the available business would not support two southern transcontinental interchange arrangements. In 1951, after a comparative hearing of all then-pending applications, it licensed a single-plane Florida to California service via New Orleans-Dallas by an interchange arrangement operated by American, Delta and National.[14] A year later the Board, without further hearings, authorized a competitive interchange service.[15] This court issued a stay, and thereupon the Board revoked the award and ordered an evidentiary hearing.[16] The Board then found that the proposed new service would be hopelessly uneconomic and denied the certificate.[17] One finding of the Board was that:

"* * * the record now shows that the proposed interchange could not obtain for itself sufficient traffic to meet the expenses of even one daily round trip from the west coast to Miami."[18]

The Board later reexamined its findings, opinion and decision and reaffirmed its conclusions.[19] Thus the Board in 1954

14. Southern Service to the West Case, 12 C.A.B. 518.

15. Southern Service to the West Case, 14 C.A.B. 310 (1951); Southern Service to the West Case, 15 C.A.B. 94 (1952).

16. Southern Service to the West Case, 15 C.A.B. 124.

17. Southern Service to the West Case, Reopened, 18 C.A.B. 234 (1953).

18. Id. at 236.

19. Southern Service to the West Case, Reopened, 18 C.A.B. 790 (1954).

concluded, after extensive evidentiary hearings, that the potential traffic between the Florida coast and the California coast was not sufficient to justify two competitive interchange services.

All the applications consolidated in the Southern Transcontinental Case seem to have included the possibility of one or more stops. Nowhere is it made to appear that any such applicant sought only a nonstop certificate, to which service the TWA one-stop service might not be potentially competitive. The comparative circuity of the St. Louis route over the proposed through routes would appear to be no greater than over the existing interchange. If the TWA one-stop service is an effective competitor to the existing interchange to the extent of a 50 per cent diversion of the latter's business (assumed by the Board *arguendo*), it seems to us the TWA service must, *prima facie*, be viewed as a potential competitor to some similar extent of any awardee of a transcontinental route Florida coast to California coast involving one or more stops. And, if the Florida-California business via interchange is enough to support service on only one route, the same business available via one carrier, but with a stop, would appear *prima facie* to be not too much greater. If these things be so, an analysis and evaluation of the available business is necessary, if demanded. To state the matter in other terms, if mutual economic exclusivity is claimed and the claim has a reasonable *prima facie* basis, hearing on the question is required.

The Board submits several answers to the foregoing. In the first place the Board says that the motions for consolidation in the St. Louis Case filed by some of the applicants for single-plane, single-carrier service from Florida to California were filed too late. Rule 12 (b) of the Board's Rules [20] requires that motions to consolidate must be filed not later than the prehearing conference in the proceeding with which consolidation

or contemporaneous consideration is requested. In the circumstances of the present case this is an unrealistic suggestion. Some of these applicants made efforts to have the Board expand the St. Louis Case so as to include transcontinental considerations. This the Board refused to do. The Board strictly limited that case to issues relating to St. Louis-Southeastern points service. With the issues thus restricted, counsel for these applicants properly restricted their participation to the presentation of evidence which was relevant to those issues. As a matter of fact the Administrative Procedure Act [21] requires the exclusion of irrelevant evidence. Indeed, as the Board seems to recognize in a footnote (5) to its opinion on reconsideration, the posing of the issue as to restrictions was an indication that the Board would prevent any award in the case from being a transcontinental route—quite the contrary to any indication that transcontinental service was to be the subject of the hearing.

In the second place the Board says that all of these applicants were in fact participants in the St. Louis Case and, as such, had an opportunity to present whatever evidence they desired to present. But this suggestion is also unrealistic under the view which we have described as applicable to the timeliness point. The Board says that these applicants were well aware of the implications of the TWA application. They obviously were initially so aware, as is evidenced by their various motions and informal requests at the beginning of the case; but, as we have pointed out, the Board severely restricted the issues to be adjudicated and as to which these parties (as applicants or as intervenors) were permitted to participate.

In the third place the Board says it made findings to the effect that there is no mutual exclusivity between the TWA award and the possible grant or grants of the applications now consolidated in the

20. 14 CFR 302.12(b).

21. Sec. 7(c), 60 Stat. 241 (1946), 5 U.S. C.A. § 1006(c).

Southern Transcontinental Case. The Board points to certain passages in its two opinions as being findings that there was no mutual exclusivity. It cites to us such passages as that the TWA route "would not in any real sense preclude a finding of public need for a more direct routing," and that the award would not "warrant the assumption that TWA will thereby obtain preferential status in deciding the issues in that case." The Board recited that there is no mutual exclusivity, but the quotations hardly qualify as "findings". They are not based on evidence, and they are not consequent to a hearing on the issue of exclusivity.

The question presently before us is not whether the Board might on some evidence before it conclude that there was no mutual exclusivity; the question is whether the applicants are entitled to a hearing on the issue. Their statutory right is to a hearing before denial of their applications; provided, of course, that the allegations of fact are sufficient to raise a debatable question. The right to a hearing is the sole question before us.

On this part of the case we hold: (1) The Board had ample authority to limit the St. Louis-Southeast Case to considerations pertinent to that area. (2) After the Board had restricted the case to area considerations and had proceeded to the end on that basis, it could not, in that same case, make a transcontinental award. (3) A *prima facie* indication of economic mutual exclusivity between the applications consolidated in the Southern Transcontinental Case and the route awarded in the St. Louis Case to TWA appears in this record. The case must therefore be remanded.

We do not intimate to the Board what steps it should take upon this remand. Our holding does not necessitate a full evidentiary comparative hearing on all applications for a southern transcontinental route. The Board might, among a number of alternative courses, (1) hold a hearing upon the exclusivity question alone or (2) impose such a restriction upon the route awarded to TWA via St. Louis as to insure that it would not be an effective competitor with any single-plane, single-carrier transcontinental route which might result from the Southern Transcontinental Case.

## II

As we have indicated, a three-carrier interchange authorizing Florida-California service via New Orleans and Dallas had been licensed in 1951. American argues that the award of a competitive transcontinental service Florida to the West Coast would be a modification of the existing interchange license to which it is a party. We held to the contrary in the Gerico Case,[22] there concluding that economic damage to an existing licensee is not a modification of the existing license, absent agency rules guaranteeing protection from economic injury.

Petitioners American and Delta also argue that the foreseeable impact of a possible award in the St. Louis Case was clearly such as to raise an issue of the public interest in a duplication of services. We have said enough under I, supra, to show we agree with that argument. The question required solution by evidence and findings, if a transcontinental award was to be made.

The Board recited its conclusion that the award to TWA was required by the public interest and necessity. But that conclusion was related to a St. Louis-Southeastern points route. It is entirely true that in making such a finding in a limited-area case the facts of the air transportation system compel consideration of out-of-area factors. We pointed this out in Frontier Airlines, Inc. v. Civil Aeronautics Board.[23] But that is not our present problem. The problem is the

22. Gerico Investment Co. v. Federal Communications Comm'n, 103 U.S.App.D.C. 141, 255 F.2d 893 (1958).

23. 104 U.S.App.D.C. 78, 259 F.2d 808 (1958).

public interest in a competing southern transcontinental service.

The Board makes much of the point that the foreseeable diversion of traffic from the interchange partners is not material to them in the light of their over-all resources. The point is immaterial on the question whether these carriers are entitled to a hearing on the possible existence of mutual exclusivity.

### III

We come now to Eastern's contentions respecting its application for an extension of its Route 10 westward from St. Louis to the West Coast and its application for an extension from Memphis to Kansas City. The former controversy concerns the award to TWA and the latter the award to Delta.

Eastern's motion in the St. Louis Case for consolidation of its pending application for a westward extension of Route 10 was denied. Eastern contends that without comparative consideration of its (Eastern's) application the award to TWA of a transcontinental service virtually identical to that proposed by Eastern violated the latter's rights under Ashbacker.

Eastern's application for a westward extension of Route 10 must be considered from two points of view. It must be considered from the point of view of the case as a St. Louis-Southeastern-area case, which is what the Board declared it to be. Then it must be considered from the point of view of a through southern transcontinental route, which is what our petitioners say the Board considered in fact.

Eastern has a network of certificated routes spread over the eastern half of the country, with westernmost termini at Chicago, St. Louis, Memphis and San Antonio. An extension from St. Louis to the West Coast would in actual practical fact create for Eastern a Boston-New York-West Coast route via St. Louis, as well as a Florida-West Coast route. The traffic accumulated by the Boston-St. Louis network is part of the "back-up traffic" which the Board says would be fed by Eastern into its new segment St. Louis-West Coast. That the traffic thus picked up in the Northeast would be greater than that originating in the Southeast seems obvious.

Quite clearly the route sought by Eastern from St. Louis westward was not within the area of the case. Also quite clearly its route Boston-New York-West Coast via St. Louis would not have been a southern transcontinental route. So, if that were all that is involved, no problem would be presented. But, as we have noted, Eastern's requested extension would also connect at St. Louis with its existing St. Louis-Florida coast route.

We first consider Eastern's application as a part of the St. Louis Case as a true area case. Eastern's extension west and TWA's extension east presented different problems in respect to traffic and the area. TWA's extension was physically within the area, and the out-of-area traffic which was involved would flow from existing routes into and through the area over the new segment. This traffic is certainly pertinent to the selection of a carrier to perform intra-area services found necessary because of service deficiencies within the area; such traffic may well, as the Board found, be used to provide the base for proper traffic development within the area.

The basic consideration in an area case is, of course, the public interest in and necessity for service in the area. It seems to us that the need of the area for service to traffic coming in from the outside and also the need of the area for service from inside the area to the outside are both proper considerations in an area case. And so the Board can properly take such needs into consideration. But we think the needs of outside traffic, considered as such, are not necessarily pertinent to an area case. Thus, to illustrate, if traffic originating in Seattle wanted very badly to go to Miami, such need, if not linked with some need inside the southeast area, would not be relevant to a southeast area case. The Board could restrict the area case by excluding such wholly outside data.

Eastern's new segment would have been outside the area, and the traffic picked up by it would have been newly picked up for transportation into the area over an existing service in the area. In other words, this application posed the problem of creating in an area service case a new route outside the area for the purpose, or with the effect, of bringing traffic into the area under consideration. We think the Board cannot be compelled to expand an area case in that way. We think this situation falls within the power of judgment vested in the Board to limit these area cases. We find no error which would require or justify our interference in the Board's decision as a limitation upon a true area case.

We now look at this application of Eastern as part of a southern transcontinental consideration, which, as we have pointed out, is what the Board appears to have undertaken and decided in part in this proceeding. Eastern's existing certificate for Route 10 apparently authorized through service St. Louis-Florida coast points. The record shows, as the Board recites in its Order No. E–13026, that Eastern actually began the operation of such a through service St. Louis-Miami nonstop. So Eastern's application for an extension westward from St. Louis would have given it a Florida-West Coast route with one stop at St. Louis. The eastward extension awarded TWA was St. Louis-Miami via intermediate points Nashville, Atlanta, Tampa and St. Petersburg. So TWA under the award could duplicate Eastern's existing St. Louis-Florida service, either with the stops indicated or nonstop, and the transcontinental route created for TWA by the award is a duplicate of the transcontinental route which would have been created for Eastern by a grant of its application.

Therefore, looking at the matter from the standpoint of a transcontinental service, Eastern occupies substantially the same position occupied by the other applicants for transcontinental certificates, discussed by us in I, supra.

The one factor possibly differentiating Eastern's transcontinental application from those of the other applicants in this case is that Eastern's proposed St. Louis-West Coast route would not be merely a southern transcontinental route but would connect to the West Coast all of Eastern's network of routes in the East. It was on this basis, and on a consideration of the potential traffic between St. Louis and points west thereof named in the application, that the Board reached its conclusion of no mutual exclusivity. The direct question as to exclusivity is whether TWA's St. Louis-Florida segment will prevent a grant of Eastern's St. Louis-West Coast segment. These are not two segments over the same route but come into competition one with the other when they are linked up with the respective existing networks. Thus the whole of both carriers' systems seem to be involved. The Board mentioned as a decisive factor the whole of Eastern's potential traffic, given the new award. It did not mention the comparative whole of TWA's potential traffic, given the new award. The Board's reasoning and the bases for its conclusion on this point are by no means clear. It refers to the substantial "back-up" traffic available to Eastern from its entire eastern network and to "these varied traffic sources". This could mean (1) that the Board did consider the whole of the traffic potentialities of both carriers, or (2) that the Board deemed the traffic potential of the single St. Louis-Southeast route awarded TWA as *de minimis* in comparison with the whole of the traffic potentially available to Eastern from the entire Southeastern area and the Northeast, or (3) some other meaning not readily discernible. So we are unable to determine whether the Board's action was or was not valid. Upon the remand the Board will make a clearer definition of its conclusion upon this point and the reasons therefor.

The Board contends that Eastern did not avail itself of the opportunity presented to it to offer evidence in support of its claim of exclusivity. The record

shows, however, that Eastern, in its petition for reconsideration of the Board Order No. E-13026, did refer to some facts on which it relied to show mutual exclusivity. The Board's reply, with its reference only to traffic available to Eastern, was inadequate. Therefore, despite Eastern's awareness that the issue of mutual exclusivity was open to it during all stages of the hearing, the Board's failure to make the necessary specific findings deprived Eastern of the full hearing required by Delta Air Lines v. Civil Aeronautics Board.[24]

In sum, as to Eastern and TWA: If the Board proceeds with the St. Louis Case so restricted as to constitute it a true St. Louis-Southeastern points area case, it need not consolidate Eastern's application for the westward extension. But, if it proceeds with the case as in practical effect a transcontinental route case, it must make adequate findings upon the problem of exclusivity, which may or may not involve a further hearing.

■ The situation of Eastern *vis-à-vis* Delta is that Delta applied for and was awarded a new segment Memphis-Birmingham, which was within the St. Louis-Southeastern area and constituted a link in a St. Louis-Florida coast service, whereas Eastern applied for and was denied a new segment Memphis-Kansas City, the latter point being well outside the area of the case and this segment being no part of a St. Louis-Southeastern service. The question is whether Eastern's Memphis-Kansas City application was required to be consolidated for comparative hearing with Delta's Memphis-Birmingham application.

Delta already has certificated routes in the St. Louis-Southeastern area. These include routes from St. Louis to Memphis and from Memphis roundabout to Jackson-Meridian-Birmingham-Atlanta and

thence to Miami. It also has a route Kansas City-Memphis. Eastern, as we have noted, already has certificated routes in the St. Louis-Southeastern area, among them one Memphis-Birmingham-Atlanta and thence to Miami. Eastern urges that the grant to Delta of the Memphis-Birmingham segment creates for Delta a through service Kansas City-Florida coast, and that its (Eastern's) application for a segment Kansas City-Memphis would have created for it, *inter alia,* precisely the same through service Kansas City-Florida points. The Board says (1) that consideration of this Eastern application would be an unwarranted expansion of the area case, and further (2) that the mandatory stops required by it to be made by Delta on any single-plane flights Kansas City-Florida points are sufficient to prevent the award from creating a service which would in any degree preclude an eventual grant to Eastern of the Kansas City-Memphis extension, with authority to overfly Memphis.

Eastern's position is, in effect, that the same considerations which apply to the treatment of the transcontinental route problem, as it arose in the St. Louis Case, apply likewise to the Kansas City service problem as it arose in that same case. We think they do not. The expansion of an area case by adding a little additional segment outside the area is quite a different thing from awarding a transcontinental certificate in a limited area case. The former is an expansion of a limited case. The latter is a transformation of the real nature of the proceedings. We are of opinion that the Board had a discretion to refuse to include in the St. Louis-Southeastern area case Eastern's application for the Memphis-Kansas City segment.

■ Eastern complains that, although the Delta award would not be mutually exclusive with one part of its

---

24. 97 U.S.App.D.C. 46, 228 F.2d 17 (1955). It is true that, unlike the instant case, the Delta case did not involve an application for a new route segment outside the limited area under consideration. However, the reasoning of that opinion requires the same kind of hearing in a case such as this, where a *prima facie* showing is made of mutual exclusivity of applications for a particular route.

application, it would preclude the award to Eastern of another part of its application, namely, the identical route, with the same mandatory stops, as that obtained by Delta. Eastern complains that the Board made no finding on this point. This Kansas City-Memphis-Birmingham-Atlanta-Florida route would be one of many combinations of routes available to Eastern from Kansas City to Southeast points. But to consider this one route separately would be to require the dissection of an area case into a number of competing segments and to require comparative consideration of each pair of parts of applications. We think there is no such requirement. Moreover in this contention Eastern splits its unrestricted application into small sections and urges that the several sections must be compared with similarly segregated sections of other applications. We think the Board is not required to do this. Were the law otherwise, the Board would be burdened with a flood of applications and motions, with consequent hearings thereon, filed by airlines whenever a new route was proposed which served any point already served by the protesting line. Such a tangle would prevent the Board from performing its statutory duty of upholding the public interest by fostering a sound air transportation system.

## IV

 Eastern contends that the TWA and Delta awards were not made upon proper findings of public convenience and necessity based on substantial evidence; that the record requires a finding that Eastern could and would satisfy all service needs in the St. Louis-Southeast market; that the Board failed to make sufficient findings on the cumulative diversion of revenue from Eastern because of awards made in this and other cases; that the Board failed to make adequate findings of the market potential; and that TWA was awarded an Atlanta-Florida service without any finding of need for such service. We have examined the record and find these contentions to be with-

out merit. While it is true that there is some evidence to support Eastern's position on certain of these issues, there is substantial evidence to uphold the challenged findings of the Board. Eastern's basic arguments concerning the lack of need for the creation of new service competitive to Eastern in the St. Louis-Southeast market are intimately tied to its contention that the Board erroneously failed to reopen the record to receive new evidence of Eastern's operations after the commencement of the hearings. These several contentions of Eastern must be viewed against the background of findings by the examiner and the Board, upon extended evidence, that Eastern's service in the Southeast area had been inadequate, that Eastern had not developed the potential market, that more traffic would result from improved service, and that there was a public need for competition in the area. Upon the facts of this case, we think the Board did not abuse its discretion in declining to reopen the record.

It is true that the Board did not find any need for the Atlanta-Florida service awarded to TWA, considered as local service. But it specifically found a need for trunkline service from St. Louis-Nashville to both Atlanta and Florida. We find no error in the Board's award of the route without an absolute restriction against local service between Atlanta and Florida.[25] The Board did place a long-haul restriction on the Atlanta-Florida segment awarded to TWA.

 Delta, while agreeing with the Board's findings on the need for a new competitive St. Louis-Southeast route, contends that the Board erred in that it awarded the new route to TWA on the basis of a "need" not in issue and failed to make certain comparative findings as to Delta's and TWA's qualifications for the route. Delta attempts to demonstrate that the Board, without so saying, actually picked TWA as the awardee upon a consideration of needs of out-of-area traffic. It says the Board specifical-

---

25. It should be noted that Eastern made no request for any such restriction.

ly excluded from the issues in the case the service needs of out-of-area traffic, *i. e.*, the needs of cities west and north of St. Louis for service into the Southeast area. Nevertheless, says Delta, the Board based the award to TWA upon such needs. But it clearly appears that the only use the Board made of out-of-area traffic data was as one of the factors in selecting the carrier best able to meet the needs of the area. The Board said:

"Aside from seasonal factors, the end-on integration of the extension from St. Louis to the Southeast with that portion of route No. 2 extending west of St. Louis will permit TWA to combine the traffic flow to and from cities east and west of St. Louis, *so as to support maximum frequencies in the St. Louis-Southeast markets and better develop the traffic potential in this area.*" (Emphasis added.)

This course was approved by us in Frontier Airlines, Inc. v. Civil Aeronautics Board, supra, and discussed herein in relation to Eastern's claim. The use of out-of-area traffic data for these purposes has no relevance to the point discussed by us in Part I, supra, which was the right of competing applications to a hearing when a transcontinental route is being awarded. We find no reversible error in the Board's selection of TWA as the awardee, if the Board is to make an area award only.

We have examined Delta's remaining contention, that the Board failed to make adequate comparative findings on certain points and find nothing that requires us to disturb the Board's disposition. It is clear that the Board in its original opinion discussed Delta's qualifications in comparison to those of TWA. Various other errors allegedly committed by the Board are urged upon us. We have examined these contentions and find no reversible error.

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.