# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 19, 2007        Decided April 29, 2008

No. 07-5092

MICHIGAN GAMBLING OPPOSITION,
A MICHIGAN NON-PROFIT CORPORATION,
APPELLANT

v.

DIRK KEMPTHORNE, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01181)

———

*John J. Bursch* argued the cause for appellant. With him on the briefs were *Rebecca A. Womeldorf*, *Daniel P. Ettinger*, and *Joseph A. Kuiper*.

*Aaron P. Avila*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief was *Elizabeth A. Peterson*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Nicholas C. Yost*, *Seth P. Waxman*, *Edward C. DuMont*, *Demian S. Ahn*, and *Conly J. Schulte* were on the brief for appellee Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians.

Before: GINSBURG, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion dissenting in part by *Circuit Judge* BROWN.

PER CURIAM: In 2005, the Assistant Secretary for Indian Affairs of the Bureau of Indian Affairs of the Department of Interior decided to take 147 acres of land in Wayland Township, Michigan, into trust for use by the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("the Tribe"), which plans to construct and operate a Class III casino. This decision followed federal recognition of the Tribe in 1998. A non-profit Michigan membership organization — Michigan Gambling Opposition ("MichGO") — sued the Secretary of the Interior, the Bureau of Indian Affairs ("BIA") and the National Indian Gaming Commission ("NIGC") (collectively the "DOI") alleging that the DOI's approval of the proposed casino violated the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et seq., and that section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, was unconstitutional. The district court granted summary judgment to the DOI, and MichGO appeals. We hold that the DOI did not violate NEPA and that section 5 of the IRA is not an unconstitutional delegation of legislative authority. Accordingly, we affirm.

**I.**

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians has lived in Michigan continuously since it emerged as

a recognizable unit under Chief Match-E-Be-Nash-She-Wish at the turn of the nineteenth century.  At that time, the Tribe lived near Kalamazoo, Michigan, along the Kalamazoo River.  The Tribe was party to several treaties with the United States, and it was adversely affected by several others, with the result that it lost all of its lands near Kalamazoo by the middle of the nineteenth century.  It avoided being moved to reservations further west by taking asylum with a church mission in central Michigan, near the town of Bradley.  Around the end of the nineteenth century, land in the church mission was distributed to individual members of the Tribe.  This distribution was in accord, although not directly part of, broader federal policies of the time, which emphasized breaking up tribal holdings and distributing parcels of land to individuals.  *See* Judith V. Royster, *The Legacy of Allotment*, 27 ARIZ. ST. L.J. 1, 10-12 (1995).  Most of the land distributed to individual members of the Tribe was lost because of failure to pay property taxes, as was the case for large portions of the land distributed under broader federal policies, *id*. at 12, but members of the Tribe continued to reside around the former church mission.

The Tribe, now numbering 277 members, secured federal acknowledgment of its existence in 1998, under the BIA's formal recognition procedure.  The Tribe and BIA plan for BIA to acquire land as a reservation for the Tribe, using the Secretary of the Interior's authority under section 5 of the IRA to take land into trust for Indians, 25 U.S.C. § 465.  They have identified a 147-acre tract of land ("the Bradley property") that they find suitable for this purpose.  The Bradley property is located in Wayland township (population 3,013), a largely rural area about twenty-five miles north of Kalamazoo and thirty miles south of Grand Rapids.  Seeking to advance the economic well-being of its members, who suffer from unemployment rates approximately six times the average of their surrounding area, and to promote economic self-sufficiency, the Tribe plans to use

the Bradley property to host a Class III gambling casino. The planned facility would comprise approximately 99,000 square feet of gambling, with additional floor space devoted to restaurants, stores, and offices. The Tribe expects 8,500 visitors per day.

As BIA studied the Tribe's proposal, it prepared an environmental assessment ("EA") under the auspices of NEPA, 42 U.S.C. § 4321 et seq. The EA analyzed the effects the proposed casino would have on area wildlife, air and water; farming in the vicinity; and nearby communities. One of the issues addressed by the EA was the possibility that the casino would increase local traffic. The EA used the U.S. Department of Transportation ("DOT") grading system to assess the severity of potential traffic delays: "Level Of Service A" means free passage, while "Level of Service F" means a driver can expect to wait eighty seconds or more before passing through an unsignaled intersection. The EA defined acceptable traffic delays to be "Level of Service C" or better. However, because Michigan does not grade intersections, the BIA concluded that approval by the Michigan Department of Transportation ("MDOT") would also qualify an intersection's traffic levels as acceptable.

Applying the DOT classification system, a study commissioned as part of the EA identified two local intersections where increased casino-related traffic would result in Level of Service F at certain times. These intersections sit at the junction of US-131, a limited access highway that runs north and south along the west edge of the Bradley property, and Michigan-179 (129th Avenue), a two-lane road that runs east and west along the south edge of the Bradley property. The study predicted that the casino would cause heavy traffic at the right turn from the northbound exit onto 129th Avenue (eastbound) and at the left turn from the southbound exit onto

129th Avenue (eastbound). Resulting delays would be particularly severe during afternoon rush hours.

To mitigate the traffic impact of the casino, the EA recommended construction of a new, dedicated right-turn lane for the northbound intersection and adding a four-way stop to the southbound intersection. It acknowledged the southbound left turn would still operate during peak periods at Level of Service F, so that a traffic light might be necessary. Although MDOT apparently will not commit to a traffic light based on predictions of traffic volume, it apparently would approve a dedicated right turn lane and a four-way stop.[1]

Having concluded that proposed measures would sufficiently alleviate traffic delays and that other potential problems identified in the EA would also be mitigated, the BIA and the NIGC both issued Findings of No Significant Impact ("FONSI") with respect to the casino project and announced their intent to acquire the Bradley property and allow the casino.

MichGO filed this lawsuit in June 2005, advancing four claims. The first alleged that the preparation of a FONSI rather than an environmental impact statement ("EIS") violated NEPA. The second and third alleged violations of the Indian Gaming Regulatory Act ("IGRA"). The fourth alleged that the IRA is an

---

[1] The EA relied on a September 25, 2001, letter from MDOT, which approved the dedicated right-turn lane; this letter did not expressly mention the four-way stop or any of the traffic study's conclusions. Letter from Robert Coy, Region Permit Agent, MDOT, to Marc Start, URS Corporation (Sept. 25, 2001). However, a letter from MDOT to the Tribe on February 12, 2002, cited the completed traffic study and approved its recommendations, which included the four-way stop. Letter from Robert Coy, Region Permit Agent, MDOT, to D.K. Sprague, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, Gun Lake Tribe (Feb. 12, 2002).

unconstitutional delegation of authority to the Secretary of the Interior because there is no intelligible principle limiting its discretion on what land to acquire and hold in trust. The Tribe was allowed to intervene as a defendant. The district court granted summary judgment to the DOI on February 23, 2007. *Mich. Gambling Opposition (MichGO) v. Norton*, 477 F. Supp. 2d 1, 22 (D.D.C. 2007). MichGO appeals and our review is de novo. *Sample v. Bureau of Prisons*, 466 F.3d 1086, 1087 (D.C. Cir. 2006). However, in view of *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007), MichGO does not pursue its IGRA claims. Appellant's Reply Br. 2 n.1.

## II.

NEPA requires every agency proposing a "major Federal action" to prepare a statement of its environmental impact if the action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). Under regulations promulgated by the Council on Environmental Quality ("CEQ") agencies must create procedures identifying "[s]pecific criteria for and identification of those typical classes of action" that require or do not require an EIS. 40 C.F.R. § 1507.3(b)(2). In considering any particular proposed action, an agency must first determine whether, under its own regulations, the proposal would "[n]ormally require[] an [EIS]" or "[n]ormally [would] not require either an [EIS] or an [EA]." *Id*. § 1501.4(a). If the proposed action is not covered by either of these descriptions, the agency should prepare an EA, and based on its conclusions, decide whether to prepare an EIS. *Id*. §§ 1501.4(b)-(c). The agency may conclude that an EIS is not necessary and instead issue a FONSI, in which it must explain why there will be no significant impact. *Id*. §§ 1501.4(e); 1508.13.

**A.**

MichGO contends that the Tribe's casino is large and controversial, and that the DOI is thus required by law to prepare an EIS. To support this contention, MichGO relies on the 2005 "Checklist for Gaming Acquisitions," distributed to regional directors by the BIA, which provides that "[p]roposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS."[2] MichGO maintains that 40 C.F.R. § 1501.4(a) requires an EIS to be performed if mandated by internal DOI guidelines such as the Checklist.

The premise underlying MichGO's contention is flawed. Section 1501.4(a) does not make the Checklist binding on the DOI. The CEQ does require each agency to "[d]etermine under its procedures" whether a project is of a type that normally requires an EIS. *Id.* § 1501.4(a). But it also specifies that these procedures will be established pursuant to section 1507.3. *Id.* Section 1507.3 sets out a specific process for developing the relevant agency procedures; as part of this process, the CEQ must approve the procedures before they are implemented. *Id.* § 1507.3(a). The DOI complied with these requirements when it established its NEPA procedures, now codified in its manual. DEP'T OF THE INTERIOR, DEPARTMENT MANUAL, Pt. 516, Chpt. 10 (May 27, 2004). These procedures do not encompass the Checklist, which in any event does not appear to have been approved by the CEQ as required by section 1507.3(a). The manual does, however, include lists of activities that under its procedures normally require or do not require an EIS or EA. *Id.* Gaming activities are not included in these lists. In these circumstances, the section 1501.4(b)-(c) process — EA preparation followed by a decision on whether to prepare an EIS

---

[2] OFFICE OF INDIAN GAMING MGMT., DEP'T OF THE INTERIOR, CHECKLIST FOR GAMING ACQUISITIONS GAMING-RELATED ACQUISITIONS AND IGRA SECTION 20 DETERMINATIONS 10 (2005) ("Checklist").

— is applicable. The DOI followed these procedures and lawfully determined not to prepare an EIS on the basis of the EA.[3]

Because we are unpersuaded that the Checklist is binding on the DOI, we do not reach MichGO's contention that the casino project at issue is "large" and "controversial" within the meaning of the Checklist.

**B.**

Alternatively, MichGO contends that it was arbitrary or capricious for the DOI to issue a FONSI without having prepared an EIS because two intersections would continue to experience Level of Service F at certain times, even after mitigation measures.[4]

A court reviews an agency's FONSI or EIS under the Administrative Procedure Act, 5 U.S.C. § 706, and "cannot substitute [its] judgment for that of an agency if the agency's decision was 'fully informed and well considered.'" *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (D.C. Cir. 1982) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC,* 435

---

[3] MichGO's suggestion in its brief that the Checklist is binding independent of 40 C.F.R. § 1501.4 is not appropriately developed and thus not properly before the court. *Schneider v. Kissinger,* 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). MichGO also maintains that ignoring non-binding regulations is arbitrary and capricious, but this contention is waived as it is raised only in the reply brief. *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990).

[4] MichGO maintains in a footnote of its initial brief and in its Reply Brief that increased traffic in the Village of Hopkins will constitute a significant, unmitigated impact. We do not consider this argument. "[A]bsent extraordinary circumstances . . . we do not entertain an argument raised for the first time in a reply brief . . . or . . . a footnote." *United States v. Whren*, 111 F.3d 956, 958 (D.C. Cir. 1997).

U.S. 519, 558 (1978)). If the agency decided to issue a FONSI, it must either have concluded there would be no significant impact or have planned measures to mitigate such impacts. A court must review whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (internal quotations omitted).

The EA found that at least one intersection would experience Level of Service F at certain times even after mitigation measures. However, contrary to the assumption underlying MichGO's contentions, the EA's definition of acceptable traffic performance was not based solely on the level-of-service classification. Rather, the EA noted that local authorities had no standards for traffic intensity; thus the EA deployed two separate indicators as proof of acceptable traffic conditions: either Level of Service C or above *or* approval by relevant local authorities. MDOT, the agency with jurisdiction over these roads, found the traffic levels projected after the DOI's mitigation measures would be acceptable. It was not inherently arbitrary or capricious for the DOI to rely on MDOT's assessment, c*f. Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 237 (5th Cir. 2006), and MichGO gives us no reason to question that reliance. The DOI was thus justified in finding that mitigation of the traffic impact was sufficient, and that an EIS was unnecessary.

**III.**

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art I, § 1. In considering a challenge to a delegation of power, "the test is whether Congress has set forth 'an intelligible principle to which the person or body authorized to act is directed to conform.'" *TOMAC,* 433 F.3d at 866 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (alterations and internal quotations omitted)). The Supreme Court has underscored that "the general policy and boundaries of a delegation 'need not be tested in isolation' . . . [as] the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)). Courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75 (internal quotations omitted).

MichGO contends that section 5 of the IRA is an unconstitutional delegation of legislative power because, apart from the DOI's internal regulations, which cannot fill the void, it is "completely devoid of intelligible standards to guide or limit the Secretary's discretion." Appellant's Br. at 35. We are not convinced. An agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power," *Whitman*, 531 U.S. at 473, as the district court incorrectly suggested, *MichGO*, 477 F. Supp. 2d at 21-22. But giving due consideration to the purpose and factual background of the IRA and section 5's statutory context, as the Supreme Court instructs, *see Am. Power & Light Co.*, 329 U.S. at 104, and having due regard that "Congress is not confined to that method of executing its policy which involves the least possible

delegation of discretion," *Yakus v. United States*, 321 U.S. 414, 425-26 (1944), we conclude the statute provides an intelligible principle.[5]

Section 5 of the IRA authorizes the Secretary of the Interior to obtain land "for Indians."[6] 25 U.S.C. § 465. This court has

---

[5] Hence the court has no occasion to address the Tribe's contention that the non-delegation doctrine is inapplicable because section 5 of the IRA does not involve a delegation of legislative power.

[6] Section 5 of the IRA provides in relevant part:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year . . . .

> . . .

> Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe . . . for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

not previously considered whether section 5 constitutes an unconstitutionally standardless delegation of power. But on its face, the delegation is no broader than other statutes, which the Supreme Court has upheld, that direct agencies to act in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), or in a way that is "fair and equitable," *Yakus,* 321 U.S. at 420, *see also Whitman*, 531 U.S. at 473-75. Furthermore, the courts of appeals for the First, Eighth and Tenth Circuits have rejected challenges contending that section 5 is an unconstitutional delegation. *See Carcieri v. Norton*, 497 F.3d 15, 41-43 (1st Cir. 2007) (en banc), *cert. granted in part, denied on non-delegation issue,* 128 S. Ct. 1443 (2008); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999). These courts have held "that an intelligible principle exists in the statutory phrase 'for the purpose of providing land for Indians' when it is viewed in the statutory and historical context of the IRA." This principle involves "providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from . . . prior [federal policy]." *South Dakota*, 423 F.3d at 799 (quoting 25 U.S.C. § 465); *accord Carcieri*, 497 F.3d at 42; *Roberts*, 185 F.3d at 1137.

Our review of the purpose and structure of the IRA confirms that, as our sister courts have held, and contrary to the view of our dissenting colleague, the statute provides an intelligible principle rather than a tautology when it authorizes the Secretary to acquire land "for the purpose of providing land for Indians": the Secretary is to exercise his powers in order to further economic development and self-governance among the Tribes. *Cf.* Dissenting Op. at 7-8. The Supreme Court has noted that "[t]he intent and purpose of the [IRA] was to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression."

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (internal quotations omitted). This accords with the IRA's stated purpose of "conserv[ing] and develop[ing] Indian lands and resources; . . . extend[ing] to Indians the right to form business and other organizations; . . . establish[ing] a credit system for Indians; . . . grant[ing] certain rights of home rule to Indians; . . . and [effectuating] other purposes." Pub. L. No. 383, 48 Stat. 984, 984 (1934).

In addition to section 5, the IRA includes numerous other provisions addressing land use and economic development; among other things, these extend tribal trusts indefinitely, 25 U.S.C. § 462; restore lands previously declared "surplus" to those trusts, *id*. § 463; restrict land transfers from tribal reservations, *id*. § 464; and provide federal appropriations to support Indian economic development, *id*. § 470. This context underscores section 5's role as part of a broad effort to promote economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies. The Supreme Court has acknowledged this emphasis, explaining that the IRA's passage brought "an abrupt end" to the previous federal "policy of allotment" that had led to individuals who were not American Indians acquiring "over two-thirds of the Indian lands allotted." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 255 (1992). The Court also emphasized that through the IRA Congress "[r]eturn[ed] to the principles of tribal self-determination and self-governance which had characterized" earlier federal policy. *Id*.

The standards revealed by examining the purpose and structure of the IRA are confirmed by reviewing the broader factual context of the statute. The IRA was enacted against a backdrop of great concern over economic and social challenges facing American Indians, and especially over the consequences

of the federal government's allotment policy, which had resulted in many tribal lands being distributed to individuals who then lost control of them, often because of fraud or inability to pay taxes. Royster, 27 ARIZ. ST. L.J. at 12. By 1928, a report commissioned by the Secretary of the Interior found that the allotment policy had "destructive effects . . . on the economic, social, cultural and physical well-being of the tribes." *Id*. at 16. As both the Supreme Court, *Mescalero Apache Tribe*, 411 U.S. at 152, and circuit courts, *South Dakota*, 423 F.3d at 798; *Carcieri*, 497 F.3d at 42, have acknowledged, the legislative history of the IRA also underscores its purpose of addressing economic and social challenges facing American Indians by promoting economic development. *See* H.R. Rep. No. 73-1804, at 6 (1934); S. Rep. No. 73-1080, at 1-2 (1934).[7]

There is nothing to suggest that section 5 is removed from the overall IRA purpose of advancing economic development

---

[7] The IRA's provisions constitute one chapter in a long and complicated history of interactions between the United States and American Indians. Our dissenting colleague asserts a trust relationship arises between the Indians and the United States only after the Government acquires land for the Indians, Dissenting Op. at 6, but this confuses the fiduciary relationship that arises because the United States is to hold newly-acquired land "in trust" under section 5 of the IRA, *see Cobell v. Norton*, 240 F.3d 1081, 1088 (D.C. Cir. 2001); *see also United States v. Wilson*, 881 F.2d 596, 600 (9th Cir. 1989), with the pre-existing "special relationship" that arose by virtue of the Government's historical relations with the Indians, *see* 1 FELIX R. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.04[4][a] (2005) ("HANDBOOK"). That unique history informs our understanding of section 5 of the IRA; a statute authorizing the acquisition of land "for the purpose of providing land for Indians" is simply not the same as a statute authorizing the acquisition of land "for the purpose of providing land for persons taller than 6 feet." *See generally* Reid P. Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213 (1975).

among American Indians. While certain sections of the IRA include more specific language than section 5, *see, e.g.*, 25 U.S.C. § 463, this does not detract from the overall purposes of the statute. Although, as our dissenting colleague suggests, particular clauses of the IRA could be interpreted as not advancing the goal of economic development, not alleviating all the problems caused by the allotment policy, or advancing goals more narrow than general economic development, Dissenting Op. at 5-7, this analysis ignores the unambiguous purpose of the IRA as a whole.

Finally, we note that the Supreme Court has observed that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. The scope of authority delegated to the Secretary under section 5 — to decide whether to grant status as "Indian Country" to specific plots of land owned by Indians or that is acquired for them — is not so broad as to require limiting principles more specific than pursuing Indian economic development. Our conclusion is underscored by examining historical and contemporary context. The Executive has historically enjoyed extensive authority in conducting relations with American Indians, which has included negotiating treaties with Indian tribes and granting reservations to them by executive order. *See, e.g.*, HANDBOOK, *supra*, §§ 1.03; 15.04[4]; *cf. Zemel v. Rusk*, 381 U.S. 1, 17-18 (1965). "[E]ven in sweeping regulatory schemes . . . statutes [are not required to] provide a determinate criterion" delimiting precisely how much of a good or harm an agency must address. *Whitman*, 531 U.S. at 475 (internal quotations omitted). Our dissenting colleague asserts that the Secretary's powers under section 5 are vast, Dissenting Op. at 10-12, pointing to the many significant consequences that flow from the Secretary's decision to accept land in trust for the Indians. But these consequences follow from section 5 and from other statutes, not from the decision of

the Secretary to acquire land in trust, for section 5 gives the Secretary no power to regulate state taxing authority or anything else. Our dissenting colleague further faults Congress for not providing a narrower standard, but Congress must provide only an "intelligible" standard, *Whitman*, 531 U.S. at 474-75. That standard need not be utterly unambiguous, for it is settled that Congress may delegate interstitial lawmaking authority to executive agencies. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).[8]

For these reasons, we join the First, Eighth and Tenth Circuits, *Carcieri*, 497 F.3d at 43; *South Dakota*, 423 F.3d at 799; *Roberts*, 185 F.3d at 1137, in upholding section 5 of the IRA. In cases entertaining (and rejecting) challenges asserting an unconstitutional delegation, the Supreme Court has "giv[en] narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional," *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989), and has done so by looking at clauses that neighbor the delegation of power, *e.g.*, *Am. Power & Light Co.*, 329 U.S. at 104-05, as well as the statute's overriding purpose, *e.g.*, *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932). Congress may legislate its goals explicitly, *see, e.g.*, *Mistretta*, 488 U.S. at 374, but it need not do so. We thus hold, relying upon the text, structure, and purpose of the IRA, as well as the context of its enactment, that section 5 contains an intelligible principle and

---

[8] Nor are we concerned, for purposes of the non-delegation doctrine, that the Secretary's decision to take land in trust might be unreviewable in a court of law. Dissenting Op. at 7-8 (citing *State of Fla., Dep't of Bus. Regulation v. U.S. Dep't of Interior*, 768 F.2d 1248 (11th Cir. 1985)). Section 5 of the IRA intelligibly guides the Secretary's exercise of discretion, and that is all that the non-delegation doctrine requires. *Yakus*, 321 U.S. at 425-26; 5 U.S.C. § 701.

that it is not an unconstitutional delegation of legislative authority.

Accordingly, we affirm the grant of summary judgment.

BROWN, *Circuit Judge*, dissenting in part: I join Parts I and II of the court's opinion, but I cannot agree § 5 of the IRA is constitutional. Consequently, I dissent from Part III.

I

Like other courts that have rejected nondelegation challenges to § 5, *Carcieri v. Kempthorne*, 497 F.3d 15, 41–43 (1st Cir. 2007) (en banc); *South Dakota v. U.S. Dep't of the Interior*, 423 F.3d 790, 799 (8th Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999), the majority nominally performs a nondelegation analysis but actually strips the doctrine of any meaning. It conjures standards and limits from thin air to construct a supposed intelligible principle for the § 5 delegation. Although I agree the nondelegation principle is extremely accommodating, the majority's willingness to imagine bounds on delegated authority goes so far as to render the principle nugatory. Analyzing the statute using ordinary tools of statutory construction, as the Supreme Court has always done in nondelegation cases, I am forced to conclude § 5 is unconstitutional.

The nondelegation doctrine prohibits Congress from making unbridled delegations of authority. The rule is not only a fundamental aspect of the separation of powers; it is an essential feature of democratic government. "[T]he delegation doctrine[] has developed to prevent Congress from forsaking its duties." *Loving v. United States*, 517 U.S. 748, 758 (1996). "[T]he constitutional question is whether the statute has delegated legislative power to the agency . . . [The Constitution's] text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *see also Mistretta v. United States*, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers . . . ."); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]t is a breach of

the National fundamental law if Congress gives up its legislative power . . . ."). The nondelegation principle is integral to any notion of democratic accountability.

Thus, when Congress directs an agency to exercise its judgment, it must guide that judgment in some way. I agree with the majority that the nondelegation principle is not an onerous requirement. Nevertheless, Congress must at least "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73; *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). The central question is whether there are "limits on [an agency's] discretion." *Whitman*, 531 U.S. at 473.

Like the majority, I take *Whitman* to have identified two ways in which Congress may provide the necessary bounds on a delegation: standards to guide an agency's judgment or, in their absence, stringent limits on the scope of the delegated authority. Standards to guide an agency are the ordinary way to limit its discretion. In the leading case, *A.L.A. Schechter Poultry Corp. v. United States*, the Supreme Court invalidated § 3 of the National Industrial Recovery Act, which allowed trade associations to develop codes of fair competition the President could adopt as law, with conditions as he thought "necessary." 295 U.S. 495, 522–23, 542 (1935). This statute was flawed because it "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474. Alternatively, "Congress need not provide any direction" if the "scope of the power congressionally conferred" is sufficiently small. *Id.* at 475. Either type of limit suffices on its own, but at least one must be present.

Thus, the "intelligible principle" required of a constitutional delegation is fairly minimal: a statute will fail only if it gives an agency too broad an authority with no standards to guide the agency's decisions. Section 5 is a rare example of a standardless delegation, allowing the Secretary of the Interior to take land in trust for whichever Indians he chooses, for whatever reasons. This power is far too broad in scope for Congress to have delegated without any standards.

II

A

First, § 5 lacks standards to guide the Secretary in the exercise of his authority. Such standards would not have to provide a "determinate criterion" to govern agency decisions, as long as they provide "substantial guidance." *Whitman*, 531 U.S. at 475. Standards need only provide some criteria, some guidelines, or some direction, so that when an agency exercises its judgment, the agency and the courts have some "intelligible principle" by which to gauge whether the agency's decision will further the purpose of the delegation. For example, to guide the Sentencing Commission, "Congress directed it to consider seven factors," listed in the statute. *Mistretta*, 488 U.S. at 375. In *Whitman*, the Clean Air Act required the EPA "to set air quality standards at the level that is 'requisite' . . . to protect the public health with an adequate margin of safety." 531 U.S. at 475–76.

"Whether [a] statute delegates legislative power is a question for the courts," *Whitman*, 531 U.S. at 473, and the purpose of an intelligible principle is to make sure it is not "impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944). Congress must provide *legal*

standards because "[p]rivate rights are protected by access to the courts to test the application of the policy in the light of" the standards. *Am. Power & Light Co.*, 329 U.S. at 105. Thus, since Congress must lay down these standards by "legislative act," *Mistretta*, 488 U.S. at 372, we should seek standards for a delegation using the ordinary tools of statutory construction.

The kinds of tools the majority uses are occasionally appropriate aids for ascertaining the meaning of ambiguous statutory text. On the other hand, when a standard is not ambiguous, but simply absent, we may not supply one by ourselves. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004). The majority not only supplies an absent standard, it actually invents the standard, imbuing § 5 with a spirit of "economic development" that somehow emanates from the context of the IRA.

In many nondelegation cases, Congress at least hints at a standard by directing an agency to exercise its authority "in the public interest"—words indicating some congressionally imposed limit, even if the vagueness of the phrase makes a court work to interpret it. Here, by contrast, the Secretary "is authorized" to acquire land for Indians "in his discretion." Rather than an ambiguous standard that requires interpretation, § 5 provides an obvious, unambiguous direction that the Secretary is to have complete discretion.

The majority proceeds, in the teeth of this clear text, to find, in the emanation from a variety of sources, the supposed true intelligible principle behind § 5: promoting Indian economic development so Indians can achieve "self-support," and recouping losses of land. But this standard arises from the majority's imagination, not from the sources.

First, the court cites the preamble to the IRA: "to conserve and develop Indian land and resources." Maj. Op. at 13. A policy of developing land is no more informative than a purpose of providing land, as a standard to help the Secretary decide whether to acquire a particular parcel. Nor do the preamble's policies of "extending the right to form business[es] . . . establishing a credit system," and the rest, give any better direction.

Second, the majority examines the structure of the IRA. Maj. Op. at 13. Among its many provisions, the IRA makes trust status permanent, §§ 2 and 4, and provides for the recovery of Indian lands that had been opened for sale, § 3. Ironically, the restoration of lands under § 3 is not automatic, but rests in the Secretary's hands. Unlike § 5 acquisitions, the Secretary is to restore surplus lands "if he shall find it to be in the public interest." Ordinarily, a comparison of § 3 and § 5 would lead us, first, to conclude § 5 gives the Secretary authority to acquire new land, and, second, to construe § 5 to grant Secretary broader discretion when he acquires new land than when he restores surplus land. Instead the majority reads into § 5 an "emphasis" on recouping losses of land, an emphasis the text does not support. The majority also sees an emphasis on preventing losses of existing land, even though § 8, which declares that the IRA shall not cover "Indian holdings of allotments or homesteads upon the public domain outside" of reservations, actually limits the effect of the IRA on existing Indian land. Nor is it plausible to find a principle of "self-support" in a statute that actually installs a paternalistic scheme of government support. *See* § 4 (barring Indians from selling or transferring their trust land); § 12 (directing the Secretary to establish preferences for hiring Indians at the Indian Office); § 11 (appropriating money to send Indians to "vocational and trade schools" of which only

a limited amount may be spent for education in "high schools and colleges"); § 6 (establishing the Secretary's authority over how Indians should manage their forests and how many cows they may graze on their pastures).

The majority also cites the special trust relationship the United States bears towards Indians, waving the idea of this relationship as a talisman to bless the statute rather than actually using it to interpret the text. Nor could this trust relationship be useful to interpret § 5, because in fact the government has no free-standing duty, outside of specific statutes, treaties, or executive orders, to ensure its actions do not harm Indian interests. *N. Slope Borough v. Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980) (Secretary's trust obligations, if any, were coterminous with the ESA's requirements); *see also United States v. Wilson*, 881 F.2d 596, 600 (9th Cir. 1989) ("Absent . . . a fiduciary duty based on an authorizing document such as a statute or a regulation . . . there can be no trust relationship between [a tribe] and the BIA."). The only trust responsibility created by § 5 exists *after* the government acquires a parcel of land and therefore cannot guide the Secretary's decision *whether* to acquire the parcel. The majority adverts to the "unique history" of Indians in the United States, but this history gives rise only to "a moral obligation, without justiciable standards for its enforcement." Reid P. Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213, 1227 (1975). At best, courts distinguish statutes relating to Indians by applying the Indian canon of construction, *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992), but "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

To summarize, the statutory language lacks any discernible boundaries. To rely on the purpose of "providing land for Indians" does nothing to cabin the Secretary's discretion over providing land for Indians because it is tautological. To say the purpose is to provide land for Indians in a broad effort to promote economic development (with a special emphasis on preventing land loss) is tautology on steroids. Making a different selection from the same smorgasbord, I might posit quite different principles—to provide land for landless Indians; to acquire trust lands to be used for farming; to supplement grazing and forestry lands; to provide lands in close proximity to existing reservations; to consolidate checkerboarded reservations. All of these goals would be reasonable, but none can be derived from the text of the IRA. The very fact that so many standards can be proposed merely highlights the fact that the statute itself fails to describe how the power conveyed is to be exercised. Thus, the Secretary's assertion of unguided power is not subject to any judicial check; nor, conversely, can he be required to act whenever he voluntarily refrains from using his discretionary power.

Even if this mood of economic self-sufficiency can be said to permeate § 5, it has never constituted a standard to guide the Secretary's decisions. Courts, like the BIA, have consistently interpreted the statute to mean what it says: the Secretary has unfettered discretion over which land to take in trust. *See, e.g.*, *State of Fla., Dep't of Bus. Regulation v. U.S. Dep't of the Interior*, 768 F.2d 1248 (11th Cir. 1985) (Secretary may waive BIA regulations to acquire land for a tribal museum, and the court may not review his decision because it is committed to agency discretion). Again and again, courts have rejected challenges to acquisitions as beyond the Secretary's power, concluding that the

"deliberately broad and flexible grant of power" in § 5, *Stevens v. Comm'r of Internal Revenue*, 452 F.2d 741, 748 (9th Cir. 1971), encompasses any possible acquisition. *E.g.*, *Chase v. McMasters*, 573 F.2d 1011, 1015–16 (8th Cir. 1978) ("Congress did not limit the Secretary's discretion to select land for acquisition"; therefore, it was valid to accept land an Indian already owned and was giving to the United States in trust solely for the purpose of avoiding property taxes). The BIA has also regarded the Secretary's discretion as absolute, and its review board may only verify whether BIA considered the factors laid out in its own regulations. *Eades*, 17 I.B.I.A. 198, 200 (1989). Most recently, BIA has begun to deny trust applications for building casinos if it finds the casinos to lie beyond a "commutable" distance from tribes' existing reservations. *See* Memorandum from Carl Artman, Ass't Sec'y of the Interior, on Taking Off-Reservation Land into Trust for Gaming Purposes 1, 3 (Jan. 3, 2008) ("The decision whether to take land into trust . . . is discretionary with the Secretary.").[1]

In light of this history, it is a bit late for the court to claim there is in fact a standard, however loose, to which the Secretary must conform in his exercise of § 5 authority. Nor, given the weight of precedent, would I expect any court to apply the majority's "economic development with special emphasis" standard in reviewing an acquisition decision.

---

[1] BIA denies these applications because for far-away applications, the benefit to Indians does not outweigh the "concerns of state and local governments." *Id.* at 5 (citing 25 C.F.R. § 151.11(b)). If the majority is right about the principle guiding these decisions, it cannot be proper for BIA to deny an acquisition because of the harm to local government caused by "the removal of the land from the tax rolls," *id.*

My point here is not to quibble with the majority's conclusion that the purpose of § 5 is to enable self-support rather than dependency or to prevent losses rather than acquire new land. Rather, the court should not be playing this game at all. Indeed, the court's approach differs radically from the Supreme Court's analytical process in nondelegation challenges. For example, in the *Intermountain Rate Cases*, the Court, recognizing that "we must be governed by the statute and its plain meaning," interpreted a challenged section to incorporate a prohibition on "undue preference and discrimination" from the text of a neighboring section. 234 U.S. 476, 485–86, 488 (1914). In *American Power & Light Co.*, the Court relied on a statute's specific standards for new security issues that constituted "a veritable code of rules" to inform the SEC's discretion to ban "unduly or unnecessarily complicate[d]" corporate structures. 329 U.S. at 105. I could continue with examples, but they all illustrate the same point: even in a nondelegation challenge, a court must find meaning for an ambiguous phrase in some relevant text. Here, by contrast, the majority perceives a mood of economic development, which Congress did not articulate, and the majority justifies this mood by its own assessment of Congress's good intentions.

In short, this court, like the First, Eighth, and Tenth Circuits before it, has constructed an intelligible principle for § 5 that consists simply of knowing why Congress enacted the provision. I do not deny that Congress wanted to alleviate the problems faced by Native Americans. Nevertheless, this alleged intelligible principle is relevant only for nondelegation challenges. The fact that the Supreme Court has also acknowledged the motivation for the IRA, Maj. Op. at 13–14, does not make that motivation any more meaningful as a standard to guide the Secretary's decisions on trust

acquisitions.[2] If it were meaningful, it would be contrary to the plain text of § 5, which gives the Secretary unfettered discretion over such decisions.

B

Given the absence of standards to govern the Secretary's exercise of his § 5 authority, I conclude the authority is too broad to be valid. Unquestionably, a standardless delegation is valid if it is small; "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. While the majority recognizes that scope matters, it fails to acknowledge that under established nondelegation doctrine, a standardless delegation must be quite narrow. *Whitman* provided the canonical example of a sufficiently small delegation: EPA can "define 'country elevators,' which are to be exempt from new-stationary-source regulations governing grain elevators." *Id*.; *see* 42 U.S.C. § 7411(i) ("Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.").

By contrast, the § 5 power is quite broad. The majority blandly characterizes it as the power to grant status as Indian country, but the majority ignores the far-reaching consequences of that status.[3] By taking land in trust for

---

[2] Amusingly, *Mescalero Apache Tribe v. Jones*, in perhaps ill-considered dicta, recited the same legislative history as the majority on its way to *limiting* the tax immunities enjoyed by Indians. 411 U.S. 145, 152–59 (1973).

[3] The majority also regards the power to hold land in trust as having aspects of Executive authority, apparently akin to the foreign

Indians, the Secretary removes it from the jurisdiction of the State in which it sits and places it under the authority of a tribe. *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 529–31 (1998) (noting federal land held in trust for Indians is Indian country (citing *United States v. McGowan*, 302 U.S. 535 (1938)). Thus, the trust acquisition authority is a power to determine who writes the law, and thus indirectly what the law will be, for particular plots of land.

The consequences of the Indian country designation are profound. Most obviously, Indian country and its beneficial owners are "exempt from State and local taxation." 25 U.S.C. § 465 para. 4. Indeed, tribal residents of Indian country are even exempt from motor vehicle and state income taxes. *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 127–28 (1993); *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 165 (1973). More generally, Indian country is subject to federal and tribal jurisdiction in both civil and criminal matters. *Native Vill. of Venetie*, 522 U.S. at 527 & n.1 (civil); *DeCoteau v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 428 n.2 (1975) (civil); *see United States v. John*, 437 U.S. 634, 649, 654 (1978) (reversing state conviction for a crime committed on trust land). A state "presumptively lacks jurisdiction to enforce" its regulations in Indian country. *Narragansett Indian Tribe v. Narragansett Elec. Co.*, 89 F.3d 908, 915 (1st Cir. 1996). A tribal sovereign ousts a state, unless Congress expressly provides otherwise. *California v. Cabazon Band of Mission Indians*,

relations powers that mitigated a delegation in *Zemel v. Rusk*, 381 U.S. 1, 17–18 (1965). Maj. Op. at 14–15. Regardless of the Executive's role in concluding treaties with Indians, "the Constitution places the authority to dispose of public lands exclusively in Congress," and that includes the power to hold lands in trust. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942); *see also* U.S. CONST. art. IV, § 3 cl. 2 (Property Clause).

480 U.S. 202, 207 (1987).[4]  These consequences result not from other statutes, as the majority claims, Maj. Op. at 15–16, but from the "attributes of sovereignty" that "Indian tribes retain."  *Id.* at 207; *see also Okla. Tax Comm'n*, 508 U.S. at 128,   Surely we need not avert our gaze from the constitutional backdrop against which Congress legislates.

Thus, § 5 allows the Secretary, by taking land in trust for Indians, to oust state jurisdiction in favor of government by the beneficiaries he chooses.  Although there are certain limits on the scope of this power, such as the restriction that land may only be held "for Indians," they are not nearly narrow enough to validate a standardless delegation.  By comparison to the EPA's authority to define country elevators, the § 5 power is astoundingly broad.  While the EPA was allowed to exempt certain pollution sources, circumscribed by size, from pollution regulations the EPA itself had imposed under a specific provision, 42 U.S.C. § 7411, here the Secretary can completely remove areas of land from the jurisdiction of state and local governments.  Although this power may not need the "substantial guidance" the Supreme Court thought necessary for the EPA's broad authority to set air-quality standards, *Whitman*, 531 U.S. at 476, the power it confers is far too broad to survive without any guidance at all.

C

---

[4] The Gun Lake Band casino project nicely illustrates how substantially a change to Indian country status can affect both Indians and non-Indians in the vicinity of trust land.  Local governments stand to lose $85,000 per year in direct property taxes, while the extra traffic and other activity connected to the casino will force local police to hire additional staff at a cost of over $400,000 per year.

Section 5 gives the Secretary unguided authority to transfer areas of land from the jurisdiction of state and local government to that of various bands of Indians. None of the foregoing implies BIA has exercised its authority wantonly. But the question is not what it has done, but what it has authority to do. The authority was Congress's to give, and the boundaries were for Congress to provide as well. Since it has failed to do so, I am forced to conclude § 5 of the IRA is an unconstitutional delegation.